185 F.3d 957 (9th Cir. 1999)
 OREGON LABORERS-EMPLOYERS HEALTH & WELFARE TRUST FUND; SCHOOL DISTRICT #1, HEALTH & WELFARE TRUST FUND; PLUMBERS, STEAMFITTERS, & SHIPFITTERS RETIREE HEALTH & WELFARE PLAN, UNITED ASSOCIATION UNION LOCAL 290; LOCAL 11 OFFICE & PROFESSIONAL EMPLOYEES INTERNATIONAL UNION, HEALTH & WELFARE
 PLAN; LOCAL 125 INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 125, EBA-PGE-IBEW LOCAL 125 HEALTH & WELFARE TRUST, Plaintiffs-Appellants,
v.
PHILIP MORRIS INCORPORATED; RJ REYNOLDS TOBACCO COMPANY; BROWN & WILLIAMSON TOBACCO CORPORATION; BRITISH AMERICAN TOBACCO COMPANY LTD; BAT INDUSTRIES PLC; LORILLARD TOBACCO COMPANY; LIGGETT GROUP INCORPORATED; AMERICAN TOBACCO COMPANY; UNITED STATES TOBACCO COMPANY; COUNCIL FOR TOBACCO RESEARCH USA INCORPORATED; TOBACCO INSTITUTE INCORPORATED; SMOKELESS TOBACCO COUNCIL INCORPORATED; HILL & KNOWLTON INCORPORATED, Defendants-Appellees.
 No. 98-36024
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted May 3, 1999
Decided July 14, 1999
 
 [Copyrighted Material Omitted]
 Steve D. Larson and Scott A. Shorr, Stoll Stoll Berne Lokting& Shlachter, Portland, Oregon, and Michael Spencer, Millberg, Weiss, Bershad, Hynes & Lerach, New York, New York, for the plaintiffs-appellants.
 Herbert M. Wachtell, Wachtell, Lipton, Rosen & Katz, New York, New York, for the defendants-appellees.
 Michael D. Reynolds, Assistant Attorney General, Salem, Oregon, for amicus curiae State of Oregon.
 Carl R. Schenker, Jr., O'Melveny & Myers, Washington, D.C., for amicus curiae Product Liability Advisory Council.
 Jan S. Amundson, National Association of Manufacturers, Washington, D.C., for amicus curiae National Association of Manufacturers.
 Appeal from the United States District Court for the District of Oregon Malcolm F. Marsh, District Judge, Presiding. D.C. No. CV-97-01051-MA.
 Before: William C. Canby, Jr., Thomas G. Nelson, Circuit Judges, and Jeremy Fogel, District Judge.[1]
 OPINION
 T.G. NELSON, Circuit Judge:
 
 
 1
 The plaintiffs in this action are six Oregon-based employee health and welfare benefit trust plans created to provide comprehensive health care benefits to their participants, who are thousands of union and public-sector workers employed under various collective bargaining agreements. Plaintiffs filed suit against defendants--eight tobacco companies, three nonprofit public relations/lobbying/research councils and one public relations firm--under federal RICO, Oregon RICO, federal and state antitrust laws, and other Oregon state laws. Plaintiffs seek to recover the costs they have incurred treating their participants' and beneficiaries' smoking-related illnesses. The district court granted judgment on the pleadings in favor of defendants, concluding that plaintiffs had failed to state a claim upon which relief could be granted. We have jurisdiction under 28 U.S.C. S 1291. We affirm.
 
 I.
 
 2
 Plaintiffs are five health and welfare trust funds that provide health care benefits to their participants and beneficiaries. These funds are formed and operated as legal trusts with each trust's mission being to pay for health care benefits for participating workers, retirees and their families.
 
 
 3
 In their complaint, plaintiffs allege the following: In the early 1950's, scientific studies linking smoking to health risks surfaced. Defendants concluded that an awareness of the health risks associated with smoking could result in regulation of the tobacco industry and threaten the industry's profitability. To prevent this from happening, defendants began a public relations campaign to persuade the public that the industry would research the health risks from tobacco and make a candid disclosure of the results. Defendants, however, entered into a conspiracy to do just the opposite.
 
 
 4
 Plaintiffs' complaint cites many examples of this alleged public relations campaign that was being waged at the same time that defendants were allegedly engaged in a covert scheme to defraud the public (including plaintiffs) as to the health risks of smoking. Defendants allegedly sought to conceal the scientific evidence about smoking risks and to maintain the powerful "lie" that the link between smoking and disease was an "open controversy." Defendants' alleged misconduct covered not only the general smoking-disease link, but also the degree of the health risk, the addictiveness of smoking, the feasibility of safer cigarettes, the actual safety of low-tar and filtered cigarettes, and the suppression of comparative safety information about different product designs. Defendants also allegedly sought to impair the development and implementation of smoking cessation programs, and fought efforts to ban smoking in the workplace.
 
 
 5
 Plaintiffs also allege that defendants conspired to restrain intercompany competition in making and marketing safer cigarettes or alternative products. Defendants allegedly stopped advertising differences in product safety, fixed the quality level of products allowed in the market, suppressed product information, and policed their agreement not to let any manufacturer introduce and market tobacco products that were safer or less hazardous. Plaintiffs allege that this conduct presents a classic case of horizontal conspiracy to fix product quality and that, as a result, cigarettes are perhaps the only product that has not gotten any safer in the last forty-five years. Finally, plaintiffs allege that defendants targeted teen smokers to replace the adult smokers that died.
 
 
 6
 As to damages, plaintiffs allege that defendants' wrongdoing injured them in two causal chains. First, defendants' alleged manipulation of information and suppression of products prevented plaintiffs from obtaining accurate information and safer products in operating their health funds, which in turn prevented plaintiffs from taking action to reduce smoking rates among their participants. This reduction in smoking rates would have led to a reduction in smoking-related disease among the funds' participants which would have in turn led to lowering plaintiffs' expenditures. Second, plaintiffs allege that defendants' wrongful fraud and concealment of information, suppression of safer products, targeting of children and manipulation of nicotine resulted in more smoking, less quitting, and smoking of more hazardous cigarettes among the funds' participants, which in turn resulted in higher incidence of disease and higher expenditures for medical bills by plaintiffs.
 
 
 7
 Plaintiffs allege that, but for defendants' conduct, plaintiffs would have undertaken stronger anti-smoking measures. Plaintiffs further allege that they have borne the brunt of smoking-related health care costs and that plaintiffs simply seek to replenish trust assets by recovering from defendants the injuries that plaintiffs have suffered as a result of defendants' misconduct.
 
 
 8
 Plaintiffs have asserted the following claims for relief: federal RICO, Oregon RICO, federal and state antitrust, Oregon's Unfair Trade Practices Act ("UTPA"), fraudulent misrepresentation and concealment, unjust enrichment, negligent breach of a special assumed duty and civil conspiracy. Plaintiffs seek damages as well as equitable and injunctive relief.
 
 
 9
 Defendants moved the district court for judgment on the pleadings on each of plaintiffs' claims or, alternatively, for dismissal for failure to join necessary parties. The district court granted defendants' motion, finding plaintiffs failed to state a claim on which relief could be granted. See Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc., 17 F. Supp. 2d 1170 (D. Or. 1998).
 
 
 10
 The district court held (1) that plaintiffs did not meet the standing or proximate cause requirements necessary to maintain either a federal or state antitrust claim; (2) that plaintiffs' injuries were entirely dependent upon injuries sustained by their participants and were thus too far removed from the challenged harmful conduct to support either a federal or state RICO claim;[2] (3) that plaintiffs did not meet the standing requirement of Oregon UTPA because they were not "consumers of defendants' products"; (4) that plaintiffs did not meet the proximate cause requirements to maintain a claim for fraud; (5) that the theories of unjust enrichment and indemnity were inapplicable; (6) that plaintiffs failed to allege the elements necessary to maintain a claim for breach of an assumed duty;[3] and (7) that plaintiffs' claim for civil conspiracy was entirely dependent on the underlying claims for fraud and UTPA violations and must therefore also fail.
 
 II.
 
 11
 We review de novo a district court's grant of judgment on the pleadings for failure to state a claim. Nelson v. City of Irvine, 143 F.3d 1196, 1200 (9th Cir. 1998)."A judgment on the pleadings is properly granted when, taking all the allegations in the pleading as true, the moving party is entitled to judgment as a matter of law." Id.
 
 III.
 A. RICO and Antitrust Claims for Damages
 
 12
 The requirements for standing to maintain a civil action under RICO and the antitrust laws are similar.[4] See Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992). Both provide a private right of action for damages only to those individuals "injured in [their ] business or property by reason of" a violation of the law's substantive provisions. 18 U.S.C. S 1964(c) (RICO); 15 U.S.C.S 15(a) (antitrust). Both also require that the alleged violation of the law be a "proximate cause" of the injury suffered. See Holmes, 503 U.S. at 268 (RICO); Blue Shield v. McCready, 457 U.S. 465, 477 (1982) (antitrust). As the Court explained in Holmes:
 
 
 13
 Here we use "proximate cause" to label generi cally the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. At bottom, the notion of proximate cause reflects ideas of what justice demands, or of what is administratively possible and convenient. Accord ingly, among the many shapes this concept took at common law was a demand for some direct relation between the injury asserted and the injurious conduct alleged.
 
 
 14
 503 U.S. at 268 (citations and quotations omitted) (emphasis added).
 
 
 15
 A direct relationship between the injury and the alleged wrongdoing, although not the "sole requirement " of RICO and antitrust proximate causation, "has been one of its central elements." Id. at 269 (citing Associated Gen. Contractors v. California State Council of Carpenters ("AGC") , 459 U.S. 519, 540 (1983)). "Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." Id. at 268-69.
 
 
 16
 To determine whether an injury is "too remote" to allow recovery under RICO and the antitrust laws, the Court applies the following three-factor "remoteness" test: (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries. See id. at 269-70 (RICO); AGC, 459 U.S. at 545 (antitrust).
 
 
 17
 Plaintiffs in the present case assert that they have suffered both "direct" injury and "indirect " injury. They claim a "direct" injury based on what they call a "one-link" causation chain. As defendants point out, however, all of plaintiffs' claims rely on alleged injury to smokers--without any injury to smokers, plaintiffs would not have incurred the additional expenses in paying for the medical expenses of those smokers. Thus, there is no "direct" link between the alleged misconduct of defendants and the alleged damage to plaintiffs. See Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 172 F.3d 223, 233 (2d Cir. 1999) (holding that because trust funds' damages "are entirely derivative of the harm suffered by plan participants as a result of using tobacco products," the damages were "indirect" and did not "proximately cause the injuries alleged" by the trusts); see also Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 928 (3d Cir. 1999) (holding that it did not matter whether plaintiffs' injuries were "direct" or "indirect" because "the plaintiffs' direct claim comes no closer than their indirect claim to meeting the proximate cause requirement for antitrust standing").
 
 
 18
 Two circuit courts have addressed the issue of a health trust fund's standing to bring antitrust and RICO actions. Both the Second and the Third Circuits have held that a trust fund's claims are "too remote" to allow recovery and that the actions are therefore barred. See Laborers Local 17, 172 F.3d 223 (addressing only RICO); Steamfitters, 171 F.3d 912 (addressing RICO and antitrust).
 
 
 19
 Because we determine that the "remoteness" test weighs in favor of barring plaintiffs' action, we agree with the Second and the Third Circuits and hold that plaintiffs' RICO and antitrust claims are "too remote" from defendants' alleged wrongdoing to allow recovery. These claims are therefore barred.
 
 
 20
 1. Existence of More Direct Victims of Alleged Wrongful Conduct
 
 
 21
 Plaintiffs argue that their "standing is confirmed" because only they, and not smokers, "can allege injury to business or property for the RICO and antitrust claims at issue here."
 
 
 22
 Plaintiffs are correct that individuals that suffer personal injury cannot claim medical expenses as "injury to business or property," and that the smokers are therefore barred from asserting RICO or antitrust claims. See Berg v. First State Ins. Co., 915 F.2d 460, 464 (9th Cir. 1990) (holding that personal injury is not "injury to business or property " and is therefore not compensable under RICO). This inability does not, however, necessarily lead to the conclusion that plaintiffs must therefore have standing.
 
 
 23
 First, "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." AGC, 459 U.S. at
 
 
 24
 534. Some injuries caused by an antitrust violation may thus be left unremedied for lack of a proper plaintiff. As we recognized in Exhibitors' Serv., Inc. v. American Multi-Cinema, Inc., 788 F.2d 574, 580 n.7 (9th Cir. 1986):"The fact that injury has occurred and that other claims have failed does not permit this court to expand the coverage of [antitrust law]."
 
 
 25
 Second, there is an identifiable group of persons-smokers--whose self-interest will motivate them to seek recovery of the damages caused by defendants' alleged wrongful conduct. Although the smokers cannot "vindicate the public interest in antitrust [or RICO] enforcement," see AGC, 459 U.S. at 542, they can "remedy the harm done by defendants' alleged misconduct. Moreover, these actions [by the smokers] will promote `the general interest in deterring injurious conduct,' which Holmes noted as the objective of this policy factor." Laborers Local 17, 172 F.3d at 235 (quoting Holmes, 503 U.S. at 269).
 
 
 26
 The existence of the smokers, who are more direct victims of the alleged wrongful conduct and who can be counted on to vindicate the injury caused by defendants' alleged wrongful conduct, weighs heavily in favor of barring plaintiffs' actions.
 
 
 27
 2. Difficulty in Ascertaining Damages Attributable to Defendants' Alleged Wrongful Conduct
 
 
 28
 Although the actual damages attributable to medical payments made by plaintiffs due to smoking-related injuries would be as easy to ascertain in the present case as in a direct action by the smokers, the other damages that plaintiffs allege would be very difficult to ascertain. As the Third Circuit stated:
 
 
 29
 The Funds' alleged damages are said to arise from the fact that the tobacco companies prevented the Funds from providing smoking-cessation or safer smoking information to their participants, some of whom would have allegedly quit smoking or begun smoking safer products, reducing their smoking related illnesses, and thereby lowering the Funds' costs for reimbursing smokers' health care expendi tures. In order to calculate the damages--i.e., the costs not lowered due to the antitrust conspiracy- the Funds must demonstrate how many smokers would have stopped smoking if provided with smoking-cessation information, how many would have begun smoking less dangerous products, how much healthier these smokers would have been if they had taken these actions, and the savings the Funds would have realized by paying out fewer claims for smoking-related illnesses.
 
 
 30
 It is apparent why the Funds argue that they can demonstrate all of this through aggregation and statistical modeling: it would be impossible for them to do so otherwise. Yet we do not believe that aggregation and statistical modeling are sufficient to get the Funds over the hurdle of the AGC factor focusing on whether the "damages claim is . . . highly speculative."
 
 
 31
 Steamfitters, 171 F.3d at 929.
 
 
 32
 The Second Circuit similarly found the damages claim of the trust funds to be highly speculative:
 
 
 33
 It will be virtually impossible for plaintiffs to prove with any certainty: (1) the effect any smoking cessation programs or incentives would have had on the number of smokers among the plan beneficiaries; (2) the counter effect that the tobacco companies' direct fraud would have had on the smokers, despite the best efforts of the Funds; and (3) other reasons why individual smokers would continue smoking, even after having been informed of the dangers of smoking and having been offered smoking cessation pro grams. On a fundamental level, these difficulties of proving damages stem from the agency of the individual smokers in deciding whether, and how frequently, to smoke. In this light, the direct injury test can be seen as wisely limiting standing to sue to those situations where the chain of causation leading to damages is not complicated by the intervening agency of third parties (here, the smokers) from whom the plaintiffs' injuries derive.
 
 
 34
 These concerns become particularly pointed in a case, like the present one, where the injuries are alleged to derive not simply from defendants' affirmative misconduct but also from plaintiffs' fraudulently induced inaction. That is, it is often easier to ascertain the damages that flow from actual, affirmative conduct, than to speculate what damages arose from a party's failure to act. In the latter situation, as in the case at hand, it becomes difficult to distinguish among the multitude of factors that might have affected the damages. Here, for example, plaintiffs' alleged damages might have derived from inefficiencies in the Funds' own management, as well as from non-smoking related health problems suffered by the smokers, and it would be the sheerest sort of speculation to determine how these damages might have been lessened had the Funds adopted the measures defendants allegedly induced them not to adopt.
 
 
 35
 Laborers Local 17, 172 F.3d at 233-34.
 
 
 36
 The difficulty of ascertaining the damages attributable to defendants' alleged wrongful conduct and the complexity involved in calculating these damages weigh heavily, if not dispositively, in favor of barring plaintiffs' actions.
 
 
 37
 3. Potential for Duplicative Recovery or Complex Apportionment of Damages
 
 
 38
 This third and final factor also weighs in favor of barring plaintiffs' actions. It is quite likely that if there are not cases by smokers already pending in Oregon, there will likely be many filed as has been seen in other states. Although the smokers cannot recover under either RICO or the antitrust laws, they can seek recovery under other state law theories for personal injury and the associated medical costs--the same damages that plaintiffs seek to recover. Moreover, although there may be some protection from multiple recovery in state law, this safeguard would not cure the ultimate problem--that the courts would be forced "to adopt complicated rules apportioning damages among plaintiffs at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." See Holmes, 503 U.S. at 269 (citing AGC, 459 U.S. at 543-44); Laborers Local 17, 172 F.3d at 230.
 
 
 39
 All three factors of the "remoteness" test weigh in favor of barring plaintiffs' claims. We therefore hold that plaintiffs lack standing to bring either a RICO or an antitrust claim for damages.[5]
 
 
 40
 B. RICO and Antitrust Claims for Equitable Relief
 
 
 41
 In addition to damages, plaintiffs seek equitable relief under RICO and the antitrust laws.
 
 1. Antitrust
 
 42
 Standing analysis for equitable relief under the antitrust laws is not the same as standing analysis for damages. See Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 110-11 & nn. 5-6 (1986). As the Court explained in Cargill:
 
 
 43
 [T]he fact is that one injunction is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one. Thus, because standing [for damages] raises no threat of multiple lawsuits or duplicative recoveries, some of the factors other than antitrust injury that are appropriate to a determination of standing [for damages] are not relevant [to a determination of standing for equitable relief].
 
 
 44
 Id. at 111 n.[6] (citation and quotation omitted) (emphasis added).
 
 
 45
 Thus, plaintiffs may not have to meet all three factors in the "remoteness" test to maintain an action for antitrust injunctive relief. Plaintiffs do, however, still have to show antitrust injury--either real or threatened. See id. at 111-13. This requirement "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place." ARCO v. USA Petroleum Co., 495 U.S. 328, 342 (1990).
 
 
 46
 An "antitrust injury" is an injury of "the type that the antitrust statute was intended to forestall." AGC, 459 U.S. at 540. "The antitrust laws . . . were enacted for the protection of competition, not competitors." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977) (quotation omitted). "The requirement that the alleged injury be related to anti-competitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors." Bhan v. NME Hosps., Inc., 772 F.2d 1467, 1470 (9th Cir. 1985). "In other words, the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." Eagle v. Star-Kist Foods, Inc., 812 F.2d 538, 540 (9th Cir. 1987).
 
 
 47
 In their complaint, plaintiffs define the antitrust market at issue as the market for cigarettes and tobacco products. Plaintiffs are neither consumers nor competitors in that market. They are not, therefore, "participants in the same market" as defendants, and they have thus not suffered "antitrust injury." See Bhan, 772 F.2d at 1470; see also Steamfitters, 171 F.3d at 926.
 
 
 48
 Plaintiffs' reliance on McCready to argue that "there is no `consumer' or market participant requirement, " is misplaced. The plaintiff in McCready filed an antitrust action against Blue Shield, claiming that Blue Shield's "practice of refusing to reimburse subscribers for psychotherapy performed by psychologists, while providing reimbursement for comparable treatment by psychiatrists, was in furtherance of an unlawful conspiracy to restrain competition in the psychotherapy market." 457 U.S. at 467. The Court held that the plaintiff, as a subscriber who had employed the services of a psychologist and thus a consumer of psychotherapy services, had standing to maintain the antitrust action. See 457 U.S. at 480-81, 48485. The Court did not hold that there is no "consumer" or "market participant" requirement.
 
 
 49
 The present case is distinguishable from McCready in several aspects. First, the plaintiff in McCready was a consumer in the relevant market of "psychotherapeutic services." See 457 U.S. at 483. In contrast, it is undisputed that plaintiffs in the present case are neither "consumers" nor "competitors" in the relevant market of cigarettes and tobacco products.
 
 
 50
 Second, the Court has explained that the broad language it used in McCready6 was simply a paraphrase of the antitrust laws and "added nothing to the even broader language that the statute itself contains." See AGC, 459 U.S. at 529 & n.19. In so explaining, the Court noted that the actual plaintiff in McCready was directly harmed by the defendants' unlawful conduct. See id.
 
 
 51
 In contrast, plaintiffs' own argument in the present case reveals that they were not directly harmed by defendants' allegedly unlawful conduct, but rather that any harm they suffered is derivative of the harm suffered by smokers.[7] As the Third Circuit stated:
 
 
 52
 It is true that, drawing on the language from McCready, we have sometimes expressed the injury requirement in terms of the harm being "inextricably intertwined" with the defendant's wrongdoing. The simple invocation of this phrase, however, will not allow a plaintiff to avoid the fundamental requirement for antitrust standing that he or she have suffered an injury of the type--almost exclusively suffered by consumers or competitors--that the anti trust laws were intended to prevent.
 
 
 53
 Steamfitters, 171 F.3d at 926 n.8 (citations omitted).
 
 
 54
 Plaintiffs have failed to allege an injury of the type that the antitrust laws were intended to prevent. Plaintiffs are neither consumers nor competitors in the relevant market of cigarettes and tobacco products. To the extent they have suffered injury, their claims are entirely derivative of the injuries suffered by smokers. Their injuries are not of a nature to establish standing for equitable relief under the antitrust laws.
 
 2. RICO
 
 55
 "[I]njunctive relief is not available to a private party in a civil RICO action." Religious Tech. Ctr. v. Wollersheim, 796 F.2d 1076, 1084 (9th Cir. 1986).
 
 C. State Law Claims
 1. Unfair Trade Practices Act
 
 56
 The UTPA grants standing to "any person who suffers any ascertainable loss of money" resulting from a violation of the law. Or. Rev. Stat. S 646.638(1). Damages predicated upon "personal injury" are not recoverable under the UTPA. See Gross-Haentjens v. Leckenby, 589 P.2d 1209, 1211 (Or. Ct. App. 1979) (holding the UTPA does not cover personal injuries). Plaintiffs' damages--expenses to treat smokers' personal injuries--are clearly predicated upon "personal injury" and are therefore unrecoverable under the UTPA.
 
 
 57
 Moreover, "the UTPA is to be construed consistently with its consumer protective purposes." Cullen v. Investment Strategies, Inc., 911 P.2d 936, 941 (Or. Ct. App. 1996); see also Raudebaugh v. Action Pest Control, 650 P.2d 1006, 1008-09 (Or. Ct. App. 1982) (noting that the purpose of UTPA is to "provide a viable remedy for consumers " and if "there is an ascertainable loss to a consumer, that consumer has a cause of action" under UTPA). This emphasis on direct protection of consumers suggests that the UTPA, like the other statutes that we have discussed, is not intended to provide a cause of action to a non-consumer that is wholly derivative of injury to consumers.
 
 2. Fraud
 
 58
 The Oregon Supreme Court recognizes the prevailing rule "that a plaintiff may not recover for economic loss resulting from negligent infliction of bodily harm to a third person," Ore-Ida Foods, Inc. v. Indian Head Cattle Co., 627 .2d 469, 473 (Or. 1981), and has extended this rule to loss resulting from fraudulent misrepresentation. See Oksenholt v. Lederle Lab., 656 P.2d 293, 299 (Or. 1982) (holding that claim for indemnity is a claim for recovery for economic loss that results from physical harm to a third person and is barred in both a negligence and fraudulent misrepresentation action under Ore-Ida).
 
 
 59
 In the present case, plaintiffs seek only to recover medical costs paid on behalf of their beneficiaries. This is a classic claim for indemnity, with plaintiffs attempting to recover for the economic loss they have suffered as a result of the physical harm suffered by third parties--the smokers. Under Ore-Ida and Oksenholt, this claim for damages is barred.
 
 
 60
 Moreover, for the same reasons that proximate cause did not exist for plaintiffs' RICO and antitrust claims, proximate cause is lacking for their fraud claim. See Oskenholt, 656 P.2d at 299 ("Damages properly recoverable in an action for intentional misrepresentation are those which are a direct and necessary result of defendant's acts or omissions.").
 
 3. Unjust Enrichment
 
 61
 Under Oregon law, to state a cause of action for unjust enrichment, plaintiffs must show that they conferred a "benefit" on defendants and that it would be unjust for defendants to retain that benefit. See L.S. Henriksen Constr., Inc. v. Shea, 961 P.2d 295, 296-97 (Or. Ct. App. 1998).
 
 
 62
 Plaintiffs allege that they conferred a "benefit" on defendants by paying the medical bills of the smokers. Plaintiffs do not, however, allege that defendants had any legal obligation to pay the medical expenses of the smokers. Without a legal obligation on the part of defendants to pay, the payment by plaintiffs did not "benefit" defendants.
 
 
 63
 Moreover, because plaintiffs had an independent obligation to pay the smokers' medical expenses, they cannot maintain an action for unjust enrichment against defendants just because defendants were incidentally benefitted. See Restatement of Restitution S 106 (1936) ("A person who, incidentally to the performance of his own duty . . . has conferred a benefit upon another, is not thereby entitled to contribution.").
 
 4. Civil Conspiracy
 
 64
 Plaintiffs' claim for civil conspiracy is entirely dependent on their underlying claims for fraud and violations of UTPA. Because these underlying claims fail, plaintiffs' civil conspiracy claim must also fail.
 
 IV.
 As the district court stated:
 
 65
 However compelling [plaintiffs'] charges may be, there are very sound judicial policy reasons for limiting legal actions to those parties most directly injured by the harmful conduct. These policies are not new and have lengthy historical roots in our jurisprudence. To allow plaintiffs to maintain actions that are entirely dependent upon the harm suffered by others threatens chaos for the judicial system, especially where others may (and have) filed their own actions and are capable of recovering a full range of damages, including the medical costs sought here.
 
 
 66
 17 F. Supp. 2d at 1183.
 
 
 67
 The district court's grant of judgment on the pleadings in favor of defendants is AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Honorable Jeremy Fogel, United States District Court Judge for the Northern District of California, sitting by designation.
 
 
 [2]
 The district court held that plaintiffs also lacked standing under Oregon RICO because they failed to allege that defendants have been convicted of mail or wire fraud as required under Oregon RICO. 17 F. Supp. 2d at 1179 (citing Or. Rev. Stat. S 166.725(7)(a)(A)). Plaintiffs have not appealed the district court's dismissal of their Oregon RICO claim. This claim is therefore waived.
 
 
 [3]
 Plaintiffs have not appealed the dismissal of their claim for breach of an assumed duty. This claim is therefore waived.
 
 
 [4]
 Plaintiffs assert claims under both federal and state antitrust laws. The Oregon antitrust statutes are almost identical to the federal antitrust statutes. Compare 15 U.S.C. SS 1, 2 with Or. Rev. Stat. SS 646.725, 646.730. In fact, Oregon courts look to federal antitrust decisions for "persuasive" guidance in interpreting the state antitrust laws. See Willamete Dental Group, P.C. v. Oregon Dental Serv. Corp., 882 P.2d 637, 640 (Or. Ct. App. 1994) (citing Or. Rev. Stat. S 646.715(2)). The district court and the parties have treated the state and federal antitrust claims as one and the same for purposes of standing analysis. We do the same.
 
 
 [5]
 Plaintiffs' argument that their standing to bring RICO and antitrust actions is "confirmed" by state and common law rules governing proximate cause, as well as trust law, ignores the test set out by the Supreme Court for analyzing standing in RICO and antitrust cases. This argument also ignores the fact that there is an alternative route for the trusts to recover the damages alleged in the present action--via subrogation in a non-RICO, non-antitrust action. See Laborers Local 17, 172 F.3d at 235.
 
 
 [6]
 In McCready, the Court stated: "As we have recognized, `[t]he statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. . . . The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." 457 U.S. at 472.
 
 
 [7]
 Plaintiffs argue that their injuries are "inextricably intertwined with that of market participants (smokers deprived of a choice of a safer product) in that the Trust paid the bills resulting from the restraint."