190 F.3d 1051 (9th Cir. 1999)
 AMERICAN AD MANAGEMENT, INC., a California Corporation; O'CONNOR AGENCY, Plaintiffs-Appellants,
v.
GENERAL TELEPHONE COMPANY OF CALIFORNIA; GTE DIRECTORIES CORPORATION; GTE DIRECTORIES PUBLISHING CORP.; GTE DIRECTORIES SERVICE CORPORATION; GTE NATIONAL MARKETING SERVICE CORP.; GTE DIRECTORIES SALES CORP., Defendants-Appellees.
 No. 97-55679
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted December 10, 1998
Decided September 9, 1999
 
 [Copyrighted Material Omitted]
 Maxwell M. Blecher, Blecher & Collins, Los Angeles, California, for the plaintiffs-appellants.
 Mark L. Callister, Callister Nebeker & McCullough, Salt Lake City, Utah, for the defendants-appellees.
 Appeal from the United States District Court for the Central District of California; Lourdes G. Baird, District Judge, Presiding. D.C. Nos. CV-92-2810 LGB, CV-93-3650-LGB.
 Before: Alfred T. Goodwin, A. Wallace Tashima, and Kim McLane Wardlaw, Circuit Judges.
 TASHIMA, Circuit Judge:
 
 
 1
 American Ad Management, Inc. and O'Connor Agency (collectively "American") appeal the district court's grant of summary judgment in favor of General Telephone Company of California and related companies (collectively "GTE"), in American's suit against GTE for asserted violations of the federal antitrust laws and related state law claims. We previously reversed the district court's award of summary judgment on the merits in favor of GTE. See American Ad Management, Inc. v. GTE Corp., 92 F.3d 781 (9th Cir. 1996) ("American Ad I"). On remand, the district court again granted summary judgment to GTE, holding that American lacks antitrust standing. American appeals, contending that it has standing under the test set forth in Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519 (1983), and theories based on American's participation in the restrained market and the fact that American's injury was inextricably intertwined with GTE's anticompetitive scheme. We have jurisdiction pursuant to 28 U.S.C. S 1291, and we reverse.
 
 I.
 
 2
 GTE publishes telephone directories commonly known as Yellow Pages. Advertisers may purchase advertising space in the directories either directly from GTE or through an Authorized Selling Representative ("ASR"). American is an ASR.
 
 
 3
 Once an ASR receives an order for advertising space, the ASR purchases the space from the publisher. The publisher sells the space to the ASR at a lower price than that given to the public, thereby providing the ASR with a commission. By charging customers a price lower than the publicly available price, the ASR passes some of the commission on to the customers. This common practice is called "discounting."
 
 
 4
 GTE is a member of the Yellow Pages Publishers Association ("YPPA"). In 1992, American filed suit against GTE, raising claims under S 1 of the Sherman Act, 15 U.S.C. S 1, other federal antitrust laws, and state law.[1] American alleges that members of the YPPA agreed to eliminate commissions on local accounts and to restrict the definition of nationalaccounts on which commissions are still paid with the effect of ending the ASRs' practice of discounting with respect to local accounts.
 
 
 5
 In 1994, the district court granted GTE's motion for summary judgment on American's antitrust claims and dismissed its supplemental state law claims on the ground that American had failed to raise a genuine issue of material fact as to whether GTE's conduct unreasonably restrained trade. American appealed. This court reversed the award of summary judgment,finding that there were disputed issues of fact with respect to all of the elements of American's claim under S 1 of the Sherman Act. See American Ad I, 92 F.3d at 792.[2] In the process of deciding whether the district court applied the correct analytical framework to the issue of whether the alleged conspiracy constituted an unreasonable restraint of trade, we found the relationship between the ASRs and the publishers to be one of agency, rather than one of retailer and wholesaler. See id. at 785. We stated, "[i]n short, ASRs do not compete with publishers in the sale of yellow pages advertising, rather the relationship is one of agency." Id. at 786 (footnote omitted). Because genuine issues of material fact existed, we remanded the case to the district court. See id. at 792.
 
 
 6
 On remand, the district court again granted summary judgment in favor of GTE, this time on the ground that American lacks antitrust standing to bring this suit. American appeals.
 
 II.
 
 7
 We review the grant of summary judgment de novo. See Tri-State Dev., Ltd. v. Johnston, 160 F.3d 528, 529 (9th Cir. 1998). Because the facts underlying the district court's conclusion that American lacked antitrust standing are not in dispute, the only question we must determine is whether the district court correctly applied the relevant law. See id. Anti-trust standing is a question of law reviewed de novo. See Amarel v. Connell, 102 F.3d 1494, 1507 (9th Cir. 1997).
 
 III.
 A. Antitrust Standing
 
 8
 Section 4 of the Clayton Act authorizes the award of damages under the antitrust laws: "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. S 15(a) (1999). This provision is quite broad, and if "[r]ead literally, could afford relief to all persons whose injuries are causally related to an antitrust violation." Amarel, 102 F.3d at 1507 (quoting Lucas v. Bechtel Corp., 800 F.2d 839, 843 (9th Cir. 1986)) (internal quotation marks omitted) (alteration in the original). The Supreme Court has determined, however, that Congress did not intend S 4 to have such an expansive scope. See Associated General, 459 U.S. at 530-35. Therefore, courts have constructed the concept of antitrust standing, under which they "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them," id. at 535, to determine whether a plaintiff is a proper party to bring an antitrust claim.[3]
 
 
 9
 Recognizing that it is "virtually impossible to announce a black-letter rule that will dictate the result in every case," id. at 536, the Supreme Court in Associated General identified certain factors for determining whether a plaintiff who has borne an injury has antitrust standing. These factors include:
 
 
 10
 (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall;
 
 
 11
 (2) the directness of the injury;
 
 
 12
 (3) the speculative measure of the harm;
 
 
 13
 (4) the risk of duplicative recovery; and
 
 
 14
 (5) the complexity in apportioning damages.
 
 
 15
 Amarel, 102 F.3d at 1507 (citing Associated General, 459 U.S. at 535); see also Lucas Automotive Eng'g, Inc. v. Bridgestone/Firestone, Inc., 140 F.3d 1228, 1232 (9th Cir. 1998) (citing same factors).
 
 
 16
 To conclude that there is antitrust standing, a court need not find in favor of the plaintiff on each factor. See Amarel, 102 F.3d at 1507. Generally "[n]o single factor is decisive." R.C. Dick Geothermal Corp. v. Thermogenics, Inc., 890 F.2d 139, 146 (9th Cir. 1989) (en banc). Instead, we balance the factors. See id. Nevertheless, we give great weight to the nature of the plaintiff's alleged injury. See Amarel, 102 F.3d at 1507. In fact, the Supreme Court has noted that "[a] showing of antitrust injury is necessary, but not always sufficient, to establish standing under S 4." Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 110 n.5 (1986).
 
 
 17
 The district court concluded that the factors weighed against American's having antitrust standing. The district court found that American's alleged injury was not the type that the antitrust laws were intended to forestall; American's damages were speculative; and allowing the suit to go forward could result in duplicative and complex damages. The only factor the district court found weighing in favor of finding antitrust standing was the directness of American's alleged injury. We respectfully disagree.[4]
 
 1. The Nature of American's Alleged Injury
 
 18
 The antitrust laws do not provide a remedy to every party injured by unlawful economic conduct. It is well established that the antitrust laws are only intended to preserve competition for the benefit of consumers. See Associated General, 459 U.S. at 538. Thus the famous aphorism, "[i]t is competition, not competitors, which the Act protects." Brown Shoe Co. v. United States, 370 U.S. 294, 344 (1962). A plaintiff may only pursue an antitrust action if it can show " `antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.' " Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) ("ARCO") (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)). Parsing the Supreme Court's definition, we can identify four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.
 
 
 19
 (1) Plaintiffs sometimes forget that the antitrust injury analysis must begin with the identification of the defendant's specific unlawful conduct. In Cargill, for example, the plaintiff alleged only that if its two competitors were allowed to merge, they would lower prices to gain market share. Theplaintiff claimed the lower prices would eventually drive it out of business, reducing competition. Cargill, 479 U.S. at 114-17. The Supreme Court rejected this allegation as a basis for antitrust injury because "[t]he kind of competition that [plaintiff] alleges here, competition for increased market share, is not an activity forbidden by theantitrust laws." Id. at 116. Without a violation of the antitrust laws, there can be no antitrust injury. In this case, we have already held that American has raised genuine issues of material fact regarding whether GTE violated S 1 of the Sherman Act. See American Ad I, 92 F.3d at 787-92.
 
 
 20
 (2) A plaintiff must also allege some credible injury caused by the unlawful conduct. There can be no antitrust injury if the plaintiff stands to gain from the alleged unlawful conduct. See e.g., Associated General , 459 U.S. at 539 (no antitrust injury because union's goals might well be served by reduced competition among employers). Competitors who challenge a rival's price-fixing are often unable to show injury. In ARCO, for example, the plaintiff alleged ARCO was engaging in maximum-price-fixing of retail prices, then a per se violation of S 1 of the Sherman Act under Albrecht v. Herald Co., 390 U.S. 145 (1968), overruled by State Oil Co. v. Khan, 522 U.S. 3 (1997). In Albrecht, the Court worried that maximum-price-fixing might develop into minimum price-fixing or might undermine the ability of dealers to provide services for which their customers were willing to pay. The plaintiff in ARCO was a competitor of ARCO's retailers, however, and the Supreme Court found it highly unlikely that the plaintiff stood to suffer from any increase in prices or from any inability of ARCO's dealers to serve their customers. The plaintiff's claim of antitrust injury was, consequently, rejected. See ARCO, 495 U.S. at 335-37. See also, e.g., Big Bear Lodging Ass'n v. Snow Summit, Inc., 182 F.3d 1096, 1102 (9th Cir. 1999) (no antitrust injury where "[p]laintiffs stand to benefit from the fact that prices for those services are inflated" as a result of alleged illegal price-fixing). We are satisfied that American stands to suffer, not gain, from GTE's alleged participation in the conspiracy to eliminate commissions to ASRs, thereby eliminating the practice of discounting to advertising consumers.
 
 
 21
 (3) It is not enough that the plaintiff's claimed injury flows from the unlawful conduct. An antitrust injury must "flow[ ] from that which makes defendants' acts unlawful." The Supreme Court articulated this requirement in its seminal opinion in Brunswick. Due to the vagaries of the bowling industry, Brunswick, a large bowling equipment manufacturer, had become "by far the largest operator of bowling centers" in the country. Brunswick, 429 U.S. at 480. Pueblo challenged Brunswick's acquisition of some of Pueblo's competitors who were on the verge of bankruptcy. Pueblo alleged that the acquisitions threatened to create a monopoly, given Brunswick's market power. Pueblo's claimed injury was the additional profit it would have earned had its competitors been allowed to fold. See id. at 479-80. The Supreme Court held that Pueblo's claimed injury did not flow from the illegality of Brunswick's conduct. If the acquisitions violated S 7, it was only because the acquisitions "brought a `deep pocket' parent into a market of `pygmies.' " Id. at 487. Pueblo's injuries, however, were unrelated to Brunswick's potential to monopolize, that which made the acquisition potentially unlawful. Any rescue of the troubled centers would injure Pueblo in the same way. See id.
 
 
 22
 This case is easily distinguished from Brunswick. Pueblo's injury flowed from any rescue of its competitors, but the rescue of the bowling centers was not in itself unlawful. It was potentially unlawful only because of Brunswick's size. Here, American's injury, its lost commissions, flows from the agreement to eliminate ASR discounts to advertising consumers. This conduct is itself potentially unlawful. We have already held that any intent by GTE to eliminate discounting is equivalent to an intent to harm competition by increasing prices. American Ad I, 92 F.3d at 789. American's injury flows from that which makes unlawful GTE's conduct, the agreement to eliminate discounts.
 
 
 23
 (4) Finally, the plaintiff's injury must be "of the type the antitrust laws were intended to prevent." The Supreme Court has made clear that injuries which result from increased competition or lower (but non-predatory) prices are not encompassed by the antitrust laws. See e.g., ARCO, 495 U.S. at 337-40 (holding no antitrust injury for business lost to lower, but non-predatory, prices resulting from alleged unlawful maximum-price-fixing; noting antitrust laws were intended to promote this kind of injury). In this case, American has not suggested its injury is the result of increased competition or lower prices.
 
 
 24
 The Supreme Court's cases have also "emphasized the central interest [of the Sherman Act] in protecting the economic freedom of participants in the relevant market." Associated General, 459 U.S. at 538. We have derived from this principle the "corollary" that the "injured party be a participant in the same market as the alleged malefactors." Bahn v. NME Hosp., Inc., 772 F.2d 1467, 1470 (9th Cir. 1985). Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained. Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury.[5] As a broker for the advertisements whose prices are allegedly restrained, American is a participant in the relevant market and it has suffered an injury in that market, the loss of commissions on advertisement purchases.
 
 
 25
 GTE claims that the "market participant" test has been narrowed by our case law to a "consumer or competitor" test. Because American is not its consumer or competitor, GTE argues American has no antitrust injury. We reject GTE's contention. The Supreme Court has never imposed a "consumer or competitor" test but has instead held the antitrust laws are not so limited. The Supreme Court's only suggestion of such a restriction is a passing comment in Associated General that the plaintiff union was "neither a consumer nor a competitor" in the relevant market. Associated General, 459 U.S. at 539. The Court did not find that fact in any way dispositive, however, and concluded the antitrust injury of unions required case-by-case consideration. See id. The previous year, in Blue Shield v. McCready, 457 U.S. 465, 472 (1982), the Court stated S 4"does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. . . . The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated."
 
 
 26
 While consumers and competitors are most likely to suffer antitrust injury, there are situations in which other market participants can suffer antitrust injury. See generally Areeda & Hovenkamp, Antitrust Law (1995 & 1998 Supp.) (analyzing possible antitrust injury of indirect purchasers (S 371), potential entrants (S 374), suppliers (S 375), licensors and landlords (S 376), and dealers (S 362c)). Not surprisingly, courts routinely recognize the antitrust claims of market participants other than consumers or competitors.[6] Anumber of our opinions do use the phrase "competitor or consumer" as a rough gloss on the Associated General/Bahn "market participant" test. But those cases usually concern parties who are clearly not participants of any kind in the restrained market.[7] We have not found any Ninth Circuit case rejecting a claim of antitrust injury by a market participant simply because the plaintiff was not a "consumer or competitor" of the defendant.[8] We do not believe our case law has superceded Supreme Court precedent as understood in Bahn. Further, it is not the status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff. See Amaral, 102 F.3d at 1508 ("Losses a competitor suffers as a result of predatory pricing is a form of antitrust injury because predatory pricing has the requisite anti competitive effect' against competitors.") (quoting ARCO, 495 U.S. at 339)).
 
 
 27
 Having analyzed all the prerequisites of antitrust injury, we conclude that American's showing is sufficient to establish that the alleged injury it suffered was an antitrust injury for purposes of antitrust standing.
 
 
 28
 2. The Directness of American's Alleged Injury
 
 
 29
 The second factor looks to whether American's alleged injury was the direct result of GTE's allegedly anticompetitive conduct. American contends that GTE increased the prices paid by consumers by eliminating the practice of discounting on local accounts, thereby causing American to suffer financial harm. To assess the directness of this injury, we look to the chain of causation between American's injury and the alleged restraint in the market for yellow pages advertising space. See Associated General, 459 U.S. at 540; Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp., 951 F.2d 1158, 1162 (9th Cir. 1991) ("[D]irectness in the antitrust context means close in the chain of causation." (quoting R.C. Dick, 890 F.2d at 147 (quoting Associated General, 459 U.S. at 540)) (internal quotation marks omitted)).
 
 
 30
 This court was presented with a similar factual scenario in Yellow Pages. The plaintiffs in that case were consulting firms ("Consultants") who offered advice to businesses on advertising efficiently in telephone directories. See Yellow Pages, 951 F.2d at 1159. The Consultants sued the publishers of the directories under the federal antitrust laws after the publishersannounced that the Consultants would no longer be allowed to place advertisements in the directories on behalf of advertisers. See id. at 1160. We found the causal link between the defendant's refusal to allow the plaintiffs to place advertisements for their clients and the plaintiffs' loss of clients to be direct for purposes of antitrust standing; "[t]here could hardly be a closer causal link than the one between GTE's refusal to let Consultants place advertisements for their clients and their clients' canceling contracts in letters to Consultants that mention the GTE policy change." Id. at 1162. There is no relevant distinction to be drawn between this scenario and that presented by the case at hand; American's alleged injury is the result of GTE's discontinuing commissions on local accounts because American's inability to provide advertisers with lower prices through discounting resulted in a loss of business.
 
 
 31
 Therefore, this factor weighs in favor of American's having antitrust standing.
 
 3. The Speculative Measure of Harm
 
 32
 Under the third factor, we consider whether American's damages are only speculative. See Associated General, 459 U.S. at 542. In Associated General, the Supreme Court found the damages claim in question to be speculative because (1) the alleged injury was indirect; and (2) "the alleged effects . . . may have been produced by independent factors." Id.; see also Eagle v. Star-Kist Foods, Inc., 812 F.2d 538, 542 (9th Cir. 1987) (citing these considerations).
 
 
 33
 We conclude that American's alleged damages are not speculative. First, as discussed above, American's alleged injury flows directly from GTE's decision to eliminate commissions on local accounts. Second, there has been no suggestion that American's alleged injury may be the result of factors other than GTE's decision to eliminate commissions. Third, although ascertaining the amount of American's damages is complicated by the fact that discounts given to customers were negotiated on a case-by-case basis and the fact that discounts varied over time, this complexity is not so unusual as to distinguish this case from other complex business disputes. "Complex antitrust cases . . . invariably involve complicated questions of causation and damages." Forsyth v. Humana, Inc., 114 F.3d 1467, 1478 (9th Cir. 1997), aff'd on other grounds, 119 S. Ct. 710 (1999). It is not uncommon for prices to fluctuate over time or by customer. Furthermore, evidence of American's past practices with respect to discounting, which may shed light on the amount of damages American has suffered, is presumably within American's control.
 
 
 34
 Thus, this is not a situation in which the determination of damages is so speculative as to call into question the existence of a link between the defendant's allegedly anticompetitive behavior and the plaintiff's injury.
 
 4. The Risk of Duplicative Recoveries
 
 35
 "The risk to be avoided under [the duplicative recovery factor] is that potential plaintiffs may be in a `position to assert conflicting claims to a common fund . . . thereby creating the danger of multiple liability for the fund.' " Eagle, 812 F.2d at 542 (quoting Associated General, 459 U.S. at 544) (omission in original). We conclude that this factor weighs in favor of finding that American has antitrust standing for two reasons.
 
 
 36
 First, the damages suffered by the ASRs and the advertisers are distinct despite their resulting from the same anticompetitive conduct. In Associated General , the Supreme Court explained the danger posed by duplicative recoveries in terms of suits by indirect purchasers to recover damages for the passing on to them of higher costs, which were the result of an antitrust violation higher up the distribution chain. See Associated General, 459 U.S. at 543 44. "[P]otential plaintiffs at each level in the distribution chain would be in a position to assert conflicting claims to a common fund,the amount of the alleged overcharge, thereby creating the danger of multiple liability for the fund and prejudice to absent plaintiffs." Id. at 544 (citing Illinois Brick Co. v. Illinois , 431 U.S. 720 (1977)). Because American's loss of business flowed directly from the advertisers' having to pay higher prices, there was no opportunity for American to pass on part of its damages to the advertisers, and no corresponding danger of duplicative recoveries under a pass-on theory.
 
 
 37
 Moreover, Yellow Pages demonstrates how advertisers could recover damages for the increased cost of yellow pages advertising space while the ASRs could recover their lost profits without claiming overlapping damages.
 
 
 38
 An advertiser with a yellow pages advertising budget of $1,000 might pay that entire sum to GTE rather than use Consultants because of the inconvenience caused by GTE's refusal to let Consultants place ads with them on its behalf. Had GTE allowed Consultants to place the ads, causing the advertiser to use Consultants, it might have paid only $500 to GTE and $200 to Consultants and retained $300 itself. The Consultants would recover the $200 in the instant suit; the advertiser might recover $300 in a subsequent suit.
 
 
 39
 Yellow Pages, 951 F.2d at 1163.[9] Applied to the case at bench, this calculation would result in American's receiving a $500 commission and passing $300 of it on to the advertiser in the form of discounting. American could recover the amount of its commission minus the discount ($200), and the advertiser could recover the discount ($300), without subjecting GTE to double recovery for the same injury.
 
 
 40
 Second, no advertiser has filed a related suit against GTE. Cf. Eagle, 812 F.2d at 542-43 (finding existence of related suit to pose danger of duplicative recoveries). That American alleges the conspiracy began in 1989 and American filed suit in 1992 suggest that if an advertiser was going to file suit, it probably would have already done so.[10]
 
 5. Complexity in Apportioning Damages
 
 41
 As discussed above with respect to the speculative measure of harm factor, we do not find the calculation of damages in this case to be exceedingly complicated. Furthermore, unlike Associated General in which damages would have had to have been apportioned among "directly victimized contractors and subcontractors and indirectly affected employees and union entities," Associated General, 459 U.S. at 545, apportioning damages in this case would require only a determination of the damages suffered by the ASRs and their customers. Therefore, this factor also weighs in favor of finding that American has antitrust standing.
 
 
 42
 In sum, all five of the Associated General factors support finding that American has antitrust standing. We conclude, therefore, that American has antitrust standing and is a proper plaintiff to bring this suit. Accordingly, we reverse the district court's award of summary judgment to GTE on American's antitrust claim. We also reverse the district court's dismissal of American's supplemental statelaw claims pursuant to 28 U.S.C. S 1367(c)(3). See American Ad I, 92 F.3d at 792.
 
 B. Request for Reassignment
 
 43
 Based on the fact that the district court has granted summary judgment to GTE three times, American asserts that "it is asking a lot of American to go back to the district court and expect to receive anything but another two year delay as the district court searches for one more basis to throw American out of court." It therefore requests that this case be remanded to a different district judge. In the absence of a showing of personal bias, however, which American does not claim, reassignment is appropriate only in "unusual circumstances." See United States v. Sears, Roebuck & Co., Inc., 785 F.2d 777, 780 (9th Cir. 1986) (quoting United States v. Arnett, 628 F.2d 1162, 1165 (9th Cir. 1979) (quoting United States v. Robin, 553 F.2d 8, 10 (2d Cir. 1977))) (internal quotation marks omitted). We conclude that the circumstances relied on by American for its request to reassign this case to another district judge are not such "unusual circumstances " as would warrant reassignment. We are confident that the district court will expeditiously set this case for trial.
 
 IV.
 
 44
 The district court's grant of summary judgment to GTE on American's claim under S 1 of the Sherman Act and dismissal of American's state law claims are reversed, and this case is remanded to the district court for further proceedings consistent with this opinion.
 
 
 45
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 O'Connor Agency filed suit against GTE in 1993, and its action was consolidated with American's action.
 
 
 [2]
 American waived its other antitrust claims in its prior appeal when it did not challenge their dismissal by the district court. See American Ad I, at 783 n.1.
 
 
 [3]
 Antitrust standing is distinct from Article III standing. A plaintiff who satisfies the constitutional requirement of injury in fact is not necessarily a proper party to bring a private antitrust action. See Associated General, 459 U.S. at 535 n.31.
 
 
 [4]
 At the outset, we reject American's argument that this court implicitly found American to have antitrust standing in American Ad I because we reversed the district court's award of summary judgment instead of affirming on other grounds. American Ad I, although relevant to the antitrust standing inquiry, raised neither the question of antitrust standing nor any of the Associated General standing factors. Furthermore, because the issue of antitrust standing can be raised at any time, see Amarel, 102 F.3d at 1507, GTE has not waived this defense by failing to have raised it prior to this point. Therefore, neither American Ad I nor this case's procedural posture compels a reversal.
 Because we conclude that American has antitrust standing under the test set forth in Associated General, we do not address American's alternative arguments.
 
 
 [5]
 We recognize that the Supreme Court has carved a narrow exception to the market participant requirement for parties whose injuries are "inextricably intertwined" with the injuries of market participants. See Blue Shield v. McCready, 457 U.S. 465 (1982); see also Ostrofe v. H.S. Crocker Co., 740 F.2d 739, 745-46 (9th Cir. 1984).
 
 
 [6]
 See, e.g., ARCO, 495 U.S. at 345 (recognizing ARCO's dealers' antitrust rights against ARCO and noting dealers could bring suit); J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 565 (1981) (analyzing dealer's antitrust injury under Robinson-Patman Act); Adaptive Power Solutions, LLC v. Hughes Missle Sys. Co., 141 F.3d 947 (9th Cir. 1998) (analyzing supplier's antitrust injury); Hasbrouck v. Texaco, Inc., 842 F.2d 1034, 1041-42 (9th Cir. 1987) (finding gasoline dealers suffered antitrust injury in Clayton Act suit against oil company), aff'd, 496 U.S. 543 (1990); Fine v. Barry and Enright Prod., 731 F.2d 1394, 1397-98 (9th Cir. 1984) (finding potential game show contestant has antitrust standing to bring S 1 claim against producers and networks limiting his appearances); Caribe BMW, Inc. v. Bayerische Motoren Werke AG, 19 F.3d 745, 753 (1st Cir. 1994) (finding dealer suffered antitrust injury from manufacturer's maximum-price-fixing); Illinois Corp. Travel, Inc. v. American Airlines, Inc., 806 F.2d 722, 729 (7th Cir. 1986) (analyzing travel agent's claim against airline under rule of reason).
 
 
 [7]
 See e.g., Oregon Laborers-Employers Health & Welfare Trust Fund v. Phillip Morris Inc., 185 F.3d 957 (9th Cir. 1999) (health plans suing tobacco companies for the costs of treating patients deceived by conspiracy among tobacco companies); Vinci v. Waste Management, Inc., 80 F.3d 1372 (9th Cir. 1996) (terminated employee and former shareholder of defendant); R.C. Dick, 890 F.2d at 148-50 (landlord and lessor of mineral rights); Eagle v. Star-Kist Foods, Inc., 812 F.2d 538, 540-41(9th Cir. 1987) (crew members of defendant's suppliers and affiliated union); Lucas v. Bechtel Corp., 800 F.2d at 844 (defendant's employees).
 
 
 [8]
 The one possible exception is Exhibitors' Serv. Inc. v. American MultiCinema, Inc. 788 F.2d 574, 578-79 (9th Cir. 1986). We believe that case is properly analyzed, however, under Brunswick . The plaintiff's injury flowed from defendants' decision not to utilize its services. That decision, however, was independent of the defendants' unlawful conduct, agreeing to split the market. The plaintiff suffered no antitrust injury because its injury was not necessary to the unlawfulness of the defendants' conduct.
 
 
 [9]
 GTE tries to distinguish Yellow Pages on the ground that the Consultants in Yellow Pages apparently were compensated on the basis of a fixed percentage of the amount the advertisers saved by placing their ads through the plaintiffs instead of directly with the publisher, while American's customers were given a negotiable, and hence varying, discount. This distinction amounts to a suggestion that there is a danger of duplicative recoveries when the calculation of damages is complicated. The complexity of the calculation of damages is more appropriately considered under the third and fifth factors of the Associated General analysis.
 
 
 [10]
 The existence of a related lawsuit is by no means a prerequisite to finding a risk of duplicative recoveries. Rather, the existence or threat of a related lawsuit merely weighs against finding in the plaintiff's favor on this factor.