**Harry TOSCANO, Plaintiff,**

v.

**PGA TOUR, INC., et al., Defendants.**

**No. CIV–S–97–1238 DFL PAN.**

United States District Court,
E.D. California.

May 2, 2002.

---

1. This Order has no effect on the Judgment as to Robert W. McAsey and Tammy McAsey– Ingle.

Thomas August Casazza, Esq., Sacramento, CA, for Plaintiff: Harry Toscano.

Pamela J. Palmieri, Esq., Littler, Mendelson, Sacramento, CA, William J. Maledon, Esq., Diane M. Johnsen, Esq., Osborn, Maledon, Phoenix, AZ, Cary M. Adams, Esq., Murphy, Austin, Adams, Schoenfeld, LLP, Sacramento, CA, for Defendants: Professional Golfers' Assoc., a Maryland nonprofit Corp., dba: Senior PGA Tour; Jim Colbert; Bruce Devlin; Terry Dill; Dale Douglass; Raymond Floyd; Gibby Gilbert; Bob Goalby; Mike Hill; Ken Still; American Express Co.; Ameritech Corp.; BankBoston Corp.; Banc One Corp.; Bell Atlantic Corp.; Bellsouth Corp.; Boone Valley, a business entity; Brickyard Crossing, a business entity; Bruno's Inc.; Burnet, a business entity; Chrysler Corp.; Country-wide Credit Industries, Inc.; Diners Club International, a business entity; Eveready Battery Co.; First of American; FHP Health Care; Ford Motor Co.; Franklin Quest Co.; General Motors, Corp.; The Gillette Co.; GTE Corp.; Hyatt Corp.; The Kroger Co.; Liberty Mutual Group; Mercedes–Benz of North America, Inc.; Nationwide Insurance Ent.; NYT Magazine Group; Paine Webber Group, Inc.; Quicksilver; RJ Reynolds Tobacco Corp.; Raley's Corp.; Ralph's Grocery Co.; Royal Carribean Cruise Line; SBC Communica-

tions, Inc.; The Scotts Co.; Toshiba Corp.; Toyota Motor Corp.; Transamerican Corp.; Truegreen–Chemlawn; Wendy's Int. Inc.; PGA Tours Inc.; Dave Stockton; Deane R. Beman; Timothy W. Finchem; Ojai Golf Charities; Gold Rush Classics; Centinela Hospital Medical Center; Classic Charities of Orange County; Grand Slam Charities; Grand Slam Charities.

## MEMORANDUM of OPINION and ORDER

LEVI, District Judge.

Plaintiff Harry Toscano ("Toscano"), a senior professional golfer, brings this antitrust action against defendants Professional Golfers Association ("PGA") Tour, Inc., the PGA Tour's player-directors, and the PGA Tour's current and past commissioners.[1] Toscano contends that the Tour used its media rights and conflicting events rules to prevent the formation of competing senior professional golf events and tours. Having monopolized the market for senior professional golf, the Tour allegedly adopted restrictive eligibility rules to protect the player directors and other Tour members from competition from other senior golfers. As a result, Toscano alleges that he was: (1) excluded from competing in and winning prize money at Senior Professional Golf Tour Association tournaments; (2) denied the opportunity to earn money through endorsements; and (3) denied the opportunity to earn prize money by participating in golf tournaments organized by would-be Tour competitors. Defendants now move for summary judgment on the alternative grounds that: (1) Toscano lacks antitrust standing to challenge the media rights and conflicting events rules; (2) the eligibility rules are not anticompetitive and do not violate antitrust law; (3)

Toscano's claim for damages is overly speculative; and (4) the player directors and the current and past commissioners are not proper defendants.

## I.

### A. *The PGA Tour's Rules and Regulations*

The Senior PGA Tour is a separate division of the PGA that co-sponsors professional golf tournaments for players over the age of 50. (Complaint at ¶ 50). Though substantially similar, Senior PGA Tour tournaments differ in several important respects from traditional PGA Tour tournaments. First, Senior Tour tournaments consist of three rounds of play instead of four. (Moorhouse Aff. at ¶ 22). Second, Senior Tour tournaments include a field of 78 golfers in contrast to a traditional 144–player field. (*Id.* at ¶ 23). Third, barring injury or illness, all 78 golfers who start a tournament on Friday are allowed to play through to its completion on Sunday while in traditional PGA Tour events there is a "cut" such that the 144–player field is "pared by fifty percent half-way through the tournament." (*Id.*) The Senior Tour's "no-cut" policy is designed to ensure that "the 'marquee' players who enter the tournament—the players the fans particularly want to see—will be playing during weekend tournament days, when most spectators will attend." (*Id.*) Moreover, according to the PGA, limiting Senior Tour events to 78 players is central to preserving the no-cut format because: (1) it would be impractical to accommodate additional players and still have all players start from the first tee; and (2) in the rare situations in which Senior Tour events start from two tees, it would be impossible

---

1. The defendants shall be referred to collectively as the "Tour." Plaintiff also sued several tournament sponsors. The sponsor defendants have been dismissed. *See Toscano v.*

*PGA Tour, Inc.,* 70 F.Supp.2d 1109 (E.D.Cal. 1999), *aff'd, Toscano v. Professional Golfers Association,* 258 F.3d 978 (9th Cir.2001).

to accommodate more than 78 players. (*Id.* at ¶ 26–27). The "no-cut" rule further ensures that every player who enters a tournament will receive some prize money. (*Id.*)

As to eligibility, the 78 players in a Senior Tour event are drawn from the following categories of golfers in the following order: (1) players with 75 or more first-place finishes in PGA Tour or Senior PGA Tour Tournaments;[2] (2) the top 31 available players from the previous year's Senior Tour Money List; (3) the top 31 available players from the All–Time Career Money List (which includes purses won both in Senior PGA Tour tournaments and in PGA tournaments); (4) the top eight players from the Tour's annual National Qualifying Tournament (in order of finishing); (5) a winner of any Senior PGA Tour co-sponsored or approved event within the previous 12 months; (6) the top four scorers in the qualifying round of play held before the tournament at hand; (7) four players designated by the tournament's local sponsor; and (8) on a space available basis, any otherwise non-exempt player who has won a Senior PGA Tour or PGA Tour tournament. (*Id.* at ¶ 31). Players in the All–Time Victories category, the top 31 players from the previous year's money list, the top 31 from the All–Career Money List, and the eight qualifiers from the National Qualifying Tournament are exempt for the entire year, such that they do not need to qualify for each open event. (*Id.* at ¶ 32). As a result, "[n]o more than approximately 5% of the places in any Tour open event are available to qualified professionals not playing under an exemption." (Complaint at ¶ 61).

The Senior PGA Tour Tournament Rules and Regulations restrict the ability of Tour members to participate in non-Tour events. Under the "conflicting events" rule, a player who qualifies to play in a Tour event generally may not enter a non-Tour tournament scheduled on the same date unless he first obtains a written release from the Tour Commissioner. (Senior PGA Tour Tournament Regulations and Handbook at 25, Exh. 4 to Maledon Aff.). The Commissioner has discretionary authority to grant a Tour member two releases annually, assuming the member participates in 15 Tour events, and to grant an additional release for every five Tour events above 15. (*Id.* at 26). The Commissioner may deny a Tour member's request for a waiver if the Commissioner determines that it "would cause [the] Tour to be in violation of a contractual commitment to a tournament or would otherwise significantly or unreasonably harm [the] Tour and such tournament." (*Id.*) Moreover, under the "television release" or "media rights" rule, Tour members must also seek the Commissioner's approval before participating in a televised tournament that is not co-sponsored or approved by the Tour, whether or not the tournament conflicts with a Tour event. (*Id.* at 27–28). Exemptions are almost always granted. (Finchem Depo. at 19:1–4). Toscano has never sought an exemption. (Toscano Depo. at 122:1–3).

The Rules and Regulations governing the Senior PGA Tour are controlled by the Tour's Division Board (the "Board"). (Senior PGA Tour Tournament Rules and Regulations at 48, Exh. 3 to Maledon Aff.). The Board is comprised of four player directors, the immediate past President of the PGA, and four independent directors, defined as "four public figures with a demonstrated interest in the game of golf." (*Id.* at 45). Player directors are elected by voting members of the Tour and hold office for a period of two years. (*Id.*) Any amendment to the Rules and Regulations must be approved by a majority of the

---

**2.** Only one golfer qualifies in this category: Jack Nicklaus.

Board, including three player directors, unless a conflict of interest exists. Amendments adopted by the Board may be reversed by a two-thirds vote of all voting members of the Tour.

Although Senior PGA Tour events are highly competitive, the purpose of the Senior Tour is not "to determine which, of all professional golfers age fifty or older, can put together the best three rounds on a particular golf course during a particular weekend." (Moorhouse Aff. at ¶ 36). Rather, "the purpose of the Senior PGA Tour is to provide a commercially viable series of tournaments for senior professional golfers that will be attractive to fans and sponsors by including star players who are over 50 years of age." (*Id.*) The Tour provides an entertainment product in which primarily well known and popular senior golfers may compete against one another.[3]

Given these goals, it is fair to say that the Senior PGA Tour has enjoyed considerable success since it was founded in 1980. (*Id.* at ¶ 10). The Senior Tour has grown from a 5 event schedule in 1981 to a current schedule that includes 43 events. (*Id.* at ¶ 11). The Tour has had similar success in attracting corporate sponsors, and total tournament prize money has increased from $250,000 in 1980 to $40,800,000 in 1997. (*Id.* at ¶ 16). Further, the Senior PGA Tour has established itself as the preeminent senior golf tour

and controls approximately 95% of the market for senior professional golf tournaments in the United States. (Tollison Decl. at 8).

The Tour contends that the eligibility and media rules are key components to ensuring the commercial viability of the Senior Tour. The Tour relies on the conflicting events rules to guarantee to sponsors and televisers that a significant number of marquee players will play in any scheduled Tour event as opposed to a competing golf event. (Defs.' Statement of Undisputed Facts ("SUF") at ¶ 9). Where the events do not actually conflict, the media rights rule ensures that the two events are not televised at the same time.[4] (Senior PGA Tour Tournament Regulations and Handbook at 27–28, Exh. 4 to Maledon Aff.). The eligibility rules preserve the Senior Tour's no-cut format ensuring that marquee players will compete for the whole of the Tournament however well, or poorly, they play in the opening rounds. (*Id.* at ¶ 18–19). By attracting marquee players, and hence the public, the rules gain the backing of sponsors who provide most of the money on which the Tour depends. (Moorhouse Aff. at ¶ 38 ("[T]he foundation of the SENIOR PGA TOUR and its longstanding success is that fans and sponsors can be drawn to a senior professional golf tournament *if the field is guaranteed to include a substantial num-*

---

**3.** The Senior PGA Tour also co-sponsors commercially lucrative invitational tournaments, and other special events including Senior Skins Games, Senior Slams, Legends of Golf, the Seniors Championship, and professional-amateur ("pro-am") events. Tour invitationals are comprised of the top 20 players from the Official All–Time Career Money List, the top 20 players from the prior year's Official Senior PGA Tour Money List, and the players or class of players specifically invited by the tournament sponsors. (Senior PGA Tour Tournament Rules and Regulations at 14, Exh. 4 to Maledon Aff.). Pro-ams are tournaments held on the weekdays preceding tour-

naments. They permit amateurs to pay in order to play alongside Senior PGA Tour golfers. (*Id.* at 16–20). Proceeds from the pro-am go primarily to local charities. Finally, the remaining special events all have distinct qualifications but are generally reserved for the most successful and popular Tour players. (*Id.* at 68).

**4.** The Tour also has a marketing rights rule which restricts the ability of persons to make commercial use of the Tour's name, marks, or logo, without advance approval. (Senior PGA Tour Tournament Regulations and Handbook at 28, Exh. 4 to Maledon Aff.).

*ber of 'name' golfers already well-known to the public.*") (emphasis in original)).

## B. *Harry Toscano*

Harry Toscano entered the world of professional golf in 1962 shortly after he graduated from college. Between 1962 and 1984, Toscano played in several tournaments on the regular PGA Tour and won $53,240.00. (Defs.' Statement of Undisputed Facts "SUF" at ¶ 2). Toscano also worked as a steel salesman, operated a go-cart track, ran a golf club repair business, and gave golf lessons at several golf clubs. (*Id.* at ¶ 3).

Toscano became eligible to play on the Senior PGA Tour in 1992 when he turned fifty years old. (Complaint at ¶ 4–5). At the end of 1992, Toscano participated in the Senior Tour's National Qualifying Tournament and finished high enough that he was a fully exempt player for all Senior Tour Events in 1993. (Defs.' SUF at ¶ 4). Toscano participated in all Senior Tour events in 1993 but because he did not finish sufficiently high on the yearly money list, he had only conditional exempt status in the following years.[5] Nevertheless, Toscano's conditional exempt status allowed him to participate in 29 of the Senior Tour's 33 events in 1994, 33 of the Tour's 34 events in 1995, and 24 of the Tour's 34 events in 1995. (Motion at 21).

In 1996, Toscano sustained a shoulder injury that substantially limited his tournament play in 1996 and 1997. (Defs.' SUF at ¶ 21). He ultimately lost his conditional exempt status for 1997 because he did not finish high enough on the previous year's money list. (Toscano Depo. at 77:5–25). However, in 1997, Toscano played in ten to twelve tournaments on the Nitro Senior Series, a competing senior professional golf tour, and finished 13th on the money list earning approximately $20,000. (Toscano Aff. at ¶ 11). Further, Toscano played in the qualifying rounds of several Senior PGA Tour tournaments in 2000 and 2001 though he failed to make it through the qualifying rounds in all but one of the tournaments. (*Id.* at ¶ 14–16). Toscano currently ranks 125th on the Senior Tour's all-time money list and has career earnings of $739,029 on the Senior Tour. (*Id.* at ¶ 9).

## C. *Toscano's Antitrust Allegations*

Toscano alleges that the Tour defendants rely on the media rights and conflicting event rules to ensure that golfers on the Senior PGA Tour are unable to play in competing events thereby "quash[ing] prospective Tour competitors' successful entry into the business of producing and operating senior professional golf tournaments." (*Id.* at ¶ 73). Toscano contends that Greg Norman's attempt to organize a competing tour was frustrated by the conflicting events rules,[6] and that another competing tour for senior golfers, the Nitro Senior Series, went bankrupt in 1997 because it was unable to attract marquee players and sponsors, again because of the Tour's conflicting events and media rights restrictions. (Toscano Aff. at ¶ 10; Tollison Decl. at 8).

Toscano further alleges that having effectively cornered the market for senior professional golf tournaments, the Tour used the eligibility rules to "limit the opportunities of new and non-exempt players to enter into or compete in the senior

---

**5.** Although Toscano describes his status as being "conditional exempt," it does not appear to be specifically defined in the Senior PGA Tour Rules and Regulations.

**6.** The PGA Tour allegedly told Norman that it would enforce the media rights and conflicting events rules to prevent Tour members from playing on his proposed "World Tour." (Complaint at ¶ 85; Tollison Aff. at 7 n. 9). However, Norman's proposed tour was for golfers at the regular PGA Tour level, not for senior golfers. (Toscano Depo. at 107:7–10).

professional tournament golf market." (Complaint at ¶ 71). In particular, Toscano argues that the PGA limits the ability of new senior professional golfers to enter into the market for the purpose of enhancing and advancing the careers "of long-term players to the exclusion of equally or better qualified players." (*Id.* at ¶ 72).

To support his claims, Toscano designated one expert witness, Dr. Robert Tollison, an economist, who submitted an affidavit and a report on the defendants' alleged anticompetitive activities. Dr. Tollison's report concludes that the PGA Tour possesses monopoly and monopsony power and that it uses its market power in an anticompetitive manner. (Tollison Decl., Exh. 3 to Casazza Aff.). Dr. Tollison relied extensively on an investigation conducted by the Federal Trade Commission and especially on a "theoretical article" published by another economist. (Tollison Depo. at 69:16–72:9). Dr. Tollison did not conduct any sort of analysis of his own to test his assertion about the anticompetitive effects of the PGA Tour's rules, nor did he conduct an economic analysis to determine if competing golf tours would be viable. (*Id.* at 92:9–25; 139:15–25).

Toscano's complaint alleges seven claims of monopolization, monopsonization, boycott, and interference with prospective economic advantage.[7] Toscano seeks $3,000,000 in damages, or $9,000,000 in treble damages, for (1) earnings equal to the prizes he otherwise would have won in Tour events; (2) endorsement income he would have earned as a result of public recognition gained through media coverage of Tour events; (3) the loss of opportunity to earn money through competing in Tour invitational events; (4) the loss of opportunity to earn money through competing in Tour-related events including invitationals; (5) the loss of benefits in the form of participation in the Senior Player Retirement Plan; (6) inability to compete for certain Tour awards that would have generated prize and endorsement income; (7) inability to compete in events reserved to tournament winners; (8) inability to compete for income from contracts to play at corporate golf outings, to consult on golf course designs, and to stage golf clinics; and (9) income that could have been won on competing tours. (Complaint at 24–26). In this summary judgment motion, defendants argue that Toscano lacks standing to attack the media rights and conflicting events rules. As to the eligibility requirements, defendants argue that the restrictions on eligibility are reasonable under the rule of reason. For these reasons, and for the additional reason that plaintiff's claims for damages are overly speculative, summary judgment shall be granted to the Tour defendants.

## II. Antitrust Standing: Media Rights and Conflicting Events Rules

Section 4 of the Clayton Act authorizes a private damages action for violations of the antitrust laws: "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). "Read literally, [Section 4] could afford relief to all persons whose

---

7. The specific claims raised in the Third Amended Complaint include: (1) monopolization and attempted monopolization against the PGA, 15 U.S.C. § 2; (2) monopsonization and attempted monopsonization against the PGA, 15 U.S.C. § 2; (3) boycott against the PGA, 15 U.S.C. §§ 1, 2; (4) attempted monopolization against Beman, Finchem, and the player directors, 15 U.S.C. § 2; (5) boycott against PGA, Beman, Finchem, and the player directors, 15 U.S.C. §§ 1, 2; (6) boycott against the player directors, 15 U.S.C. §§ 1, 2; (7) boycott, 15 U.S.C. § 1. Two additional claims against golfer David Stockton were dismissed by plaintiff prior to hearing on the Tour's motion.

injuries are causally related to an antitrust violation." *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir.1996) (citation omitted). "The Supreme Court has determined, however, that Congress did not intend § 4 to have such an expansive scope. Therefore, courts have constructed the concept of antitrust standing, under which they 'evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them,' to determine whether a plaintiff is a proper party to bring an antitrust claim." *American Ad Mgmt. Inc. v. GTE*, 190 F.3d 1051, 1054 (9th Cir.1999) (internal citation omitted).

 Antitrust standing is generally determined by reference to five factors: (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to prevent; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. (*Id.*) The plaintiff does not need to prevail on each factor to establish standing, and no single factor is dispositive, although the absence of antitrust injury is fatal. *Id.* at 1055; *see also R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 146 (9th Cir.1989) (en banc). In light of these factors, the court finds that plaintiff Toscano lacks standing to attack the media rights and conflicting events rules.

### A. *Nature of the Alleged Injury*

 Toscano may only pursue an antitrust action if he demonstrates an "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 1055 (citing *Atlantic Richfield Co. v. USA*

*Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (emphasis in original)). The antitrust injury requirement also mandates that an " 'injured party [must] be a participant in the same market as the alleged malefactors.' " *Id.* (citing *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 538, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

Defendants argue that Toscano fails the antitrust injury requirement because he is "neither a consumer nor a competitor in the market in which trade was restrained." (Motion at 10). The defendants' argument fails, however, because an antitrust plaintiff does not need to be a competitor or consumer of the defendant. *See American Ad Mgmt.*, 190 F.3d at 1058 ("it is not the status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff"). Instead, as a professional golfer allegedly excluded from the senior professional golf tournament market, Toscano is a market participant and satisfies the antitrust injury requirement.[8] (*Id.*) ("Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained.").

### B. *Directness of the Injury*

 The directness inquiry requires the court to analyze "the chain of causation between [Toscano's] injury and the alleged restraint in the market." To prevail on this factor, Toscano's injuries must be close in the chain of causation to the alleged market restraint. *Id.* at 1058; *see also Yellow Pages Cost Consultants v. GTE Directories Corp.*, 951 F.2d 1158, 1162 (9th Cir.1991). A plaintiff who complains of an injury that is too remote from the alleged restraint or that is derivative

---

**8.** For purposes of this motion, defendants do not challenge Toscano's description of the market. (Reply at 14 n. 8).

of an injury suffered by a third party absent from the suit is generally unable to establish antitrust standing. *See Ass'n of Wash. Pub. Hosp. Dist. v. Philip Morris Inc.,* 241 F.3d 696 (9th Cir.2001) (public hospital districts and their associations could not establish antitrust standing in suit against tobacco companies for unreimbursed costs of treating patients' smoking-related health problems; plaintiffs' injuries were wholly derivative of injuries suffered by plaintiffs' patients); *Oregon Laborers Employers Health & Welfare Trust Fund v. Philip Morris Inc.,* 185 F.3d 957 (9th Cir.1999) (antitrust injuries alleged by employee health benefit plan against tobacco companies did not support standing because they were derivative of smoking-related illnesses of plaintiffs' members). Finally, the existence of "an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party ... to perform the office of a private attorney general." *Associated Gen. Contractors,* 459 U.S. at 542, 103 S.Ct. 897.

Toscano alleges that the Tour's rules "keep players, sponsors, pro-am participants, and live audiences away from competing senior professional golf tournaments, and so ... preclude other tours from competing in the senior professional tournament golf market." (Complaint at ¶ 81). Further, Toscano alleges that by maintaining anticompetitive levels of senior professional golf, the rules effectively prevented him from winning prize money on rival hypothetical senior golf tours as well as from earning additional income from the sort of media exposure he might gain from competing on such a tour. (*Id.* at ¶ 99).

Toscano's allegations with respect to the media rules and conflicting events rules are both remote and derivative. As to remoteness, Toscano alleges no direct injury from these rules. He does not claim that the rules were ever applied to him. Nor does he claim that he attempted to do business with a Tour member who was subject to the restrictions. Rather, his claims depend on a multitude of speculative intervening events including: the formation of competing senior professional golf tours in the absence of the media rights and conflicting events rules, the ability of competing tours to attract sufficient sponsors to remain solvent, Toscano's ability to qualify to play on such hypothetical tours, and Toscano's ability to actually win prize money on these tours. *See* II Phillip Areeda, Roger Blair & Herbert Hovenkamp, Antitrust ¶ 339b, at 326–27 (2d ed. 2000) ("If what makes causation doubtful is the number or improbability of steps in the chain from alleged violation to injury, then dismissal for remoteness is in order.").

Moreover, Toscano's injuries are also derivative of the injuries allegedly suffered by the organizers of would-be competing senior professional golf tours. It is their exclusion from the market, and thus their antitrust injury in the first instance, that will ultimately cause Toscano's derivative harm by preventing him from reaping the benefits of playing on rival tours. Thus, like the public hospitals and employee health plans in *Ass'n of Wash. Pub. Hosp. Dists.* and *Oregon Laborers Employers Health & Welfare Trust Fund,* or the unions in *Associated Gen. Contractors,* Toscano's injury is entirely dependent on an injury to third parties closer in the chain of causation to the alleged market restraint. *See id.* ¶ 339d, at 329–31 (explaining that summary judgment may be appropriate if plaintiff's antitrust injury is derivative but only "quasi-duplicative"). Therefore, if, as Toscano alleges, the media rights rules and conflicting events rules are indeed anticompetitive and preclude the formation of rival tours, the anti-

trust laws provide these putative tours with a remedy.[9] *See id.* ¶ 396, at 564 (explaining antitrust cause of action for parties excluded from participating in a market). The existence of parties closer in the chain of causation to the market restraint and capable of bringing their own antitrust suit, however, "diminishes the justification for allowing a more remote party" like Toscano to bring a suit of his own.[10]

### C. *Speculative Measure of the Harm*

Under the third factor, the court concludes that Toscano's damages are merely speculative because his injury is indirect and "may have been produced by independent factors." *American Ad Mgmt.*, 190 F.3d at 1059 (citing *Associated Gen. Contractors*, 459 U.S. at 542, 103 S.Ct. 897). As noted above, Toscano's alleged injuries are all indirect and derivative. Further, Toscano's injuries due to the media rights and conflicting events rules—loss of potential winnings on rival tours and potential endorsements—could have been caused by independent factors including lack of demand for another senior professional golf tour, mismanagement by PGA rivals, Toscano's own shoulder problem or lack of skill. For these reasons, this factor weighs against Toscano.

### D. *Risk of Duplicative Recovery*

"'The risk to be avoided under [the duplicative recovery factor] is that potential plaintiffs may be in a 'position to assert conflicting claims to a common fund ... thereby creating the danger of multiple liability for the fund.'" *American Ad Mgmt.*, 190 F.3d at 1059. As the Ninth Circuit explained in *American Ad Mgmt.*, the duplicative recovery factor stems from the Supreme Court's concern that the plaintiff's damages be distinct from those of other potential plaintiffs, even if they result from the same anticompetitive conduct. (*Id.*) Because Toscano's damages are distinct from the potential damages of other parties who might complain about the defendants' allegedly unlawful conduct, the court finds that this factor weighs in favor of Toscano. For example, any damages awarded to the organizers of a competing tour would not duplicate Toscano's alleged damages for loss of prize money and potential endorsement contracts. Thus, Toscano's antitrust allegations do not present a risk of duplicative recovery.

### E. *Complexity in Apportioning Damages*

Although Toscano's claims do not present the risk of duplicative recovery, the

**9.** Beyond the mere allegations contained in his complaint, Toscano has failed to provide any evidence that any Senior PGA Tour rivals were precluded from entering the market due to anticompetitive activity. Toscano's own expert witness conceded that he had never even spoken with anyone associated with the Nitro Senior Series about the impact of the conflicting event or media rights rule or whether they were unable to attract marquee players. (Tollison Depo. at 148:6–23). Likewise, Toscano never attempted to determine why Greg Norman's proposed tour, for regular PGA level players, never got off the ground. Finally, the evidence submitted by Dr. Tollison which purportedly shows that it is more expensive to purchase advertising—calculated as the cost of advertising per thou-

sand viewers reached—for golf tournaments than for any other sporting event, is equally consistent with the fact that there are fewer viewers of golf tournaments as it is with the fact that the Tour's rules artificially constrain the market. (*See* Tollison Aff.).

**10.** Toscano's sole attempt to demonstrate a direct injury caused by the media and conflicting events rules—he was playing on the Senior Series in 1997 when it shut down allegedly due to the rules—is misplaced. (Opp. at 18). This evidence merely demonstrates that Toscano has a personal injury that is not duplicative of an injury suffered by the Senior Series. It does not, however, prove that Toscano's injury was directly caused by the alleged anticompetitive conduct.

fact that his alleged injuries are both indirect and derivative would require a complex trial to apportion damages. As in *Associated Gen. Contractors,* determining Toscano's damages would be a cumbersome and complex ordeal that would involve separating Toscano's damages from the damages of more immediate victims including Tour rivals and sponsors, determining if the Senior Series failed due to the Senior PGA Tour's anticompetitive activities or because of other benign factors, and determining how a fully competitive market for senior professional golf tournaments would affect Toscano's ability to win prize money. For example, estimating the size of the purses that might have been offered and then might have been won involves a calculation of how supposed rival tours were damaged and then how this damage was passed along to Toscano. *See Associated Gen. Contractors,* 459 U.S. at 545, 103 S.Ct. 897 ("[T]he District Court would face problems of identifying damages and apportioning them among directly victimized contractors and subcontractors and indirectly affected employees and union entities. It would be necessary to determine to what extent the coerced firms diverted business away from union subcontractors, and then to what extent those subcontractors absorbed the damage to their businesses or passed it on to employees by reducing the workforce or cutting hours or wages."). Thus, this factor weighs against Toscano.

## F. *Conclusion*

▬▬▬ Toscano's alleged injuries stemming from the media rights and conflicting events rules are indirect, speculative, and complex. Although Toscano may have pleaded an injury of the sort that is the subject of the federal antitrust laws, the indirectness of the injury and the speculative nature of his damages predominate and preclude a finding of standing. Further, while the absence of an antitrust injury may be fatal to a putative antitrust plaintiff, the mere appearance of an antitrust injury in a lawsuit otherwise notable for its absence of a direct connection between plaintiff and injury is insufficient as a matter of law to establish antitrust standing. *See Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) ("A showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4, because a party may have suffered antitrust injury but may not be a proper plaintiff under § 4 for other reasons."); *Angelico v. Lehigh Valley Hosp., Inc.,* 184 F.3d 268, 274 (3d Cir.1999) (same). Moreover, denying recovery on the basis of standing is no mere technicality as Toscano suggests. Rather, the doctrine of antitrust standing serves an important interest in ensuring that only the parties most injured by anticompetitive conduct are permitted to sue and collect treble damages. *See* II P. Areeda, Roger Blair & H. Hovenkamp, Antitrust ¶ 335, at 300–01 (2d ed.2000) (noting dangers of expanding antitrust standing). For these reasons, the court finds that Toscano lacks standing to challenge the media rights and conflicting events rules.[11]

---

11. There is no merit to Toscano's argument that in considering the question of standing, *Continental Ore Co. v. Union Carbide,* 370 U.S. 690, 698–99, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), compels the court to aggregate the effects of the media and conflicting events rules and the eligibility rules. First, as the Ninth Circuit observed in *Vinci v. Waste Mgmt., Continental Ore* "does not apply to the issue whether a person has standing to challenge antitrust behavior." *Id.* 80 F.3d 1372, 1374 (9th Cir.1996). Thus, whatever the meaning of a Supreme Court decision rendered prior to substantial later developments in antitrust law, the Ninth Circuit does not

### III. Eligibility Rules

#### A. *Rule of Reason versus Quick Look Analysis*

 Under section 1 of the Sherman Antitrust Act: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. Courts have long since recognized that Section 1 cannot be read literally because "nearly every contract that binds the parties to an agreed course of conduct 'is a restraint of trade' of some sort." *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1016 (10th Cir. 1998). Thus, the Sherman Act does not condemn a mere "restraint of trade," but instead bars only "unreasonable restraints of trade." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 98, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); *see also Bd. of Trade of City of Chicago v. U.S.*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

 Courts rely on three tests to determine whether an agreement constitutes an unreasonable restraint of trade: (1) *per se* analysis; (2) quick-look analysis; and (3) the rule of reason. Although sometimes discussed as wholly separate tests, "the three methods are best viewed as a continuum, on which the 'amount and range of information needed' to evaluate a restraint varies depending on how 'highly suspicious' and how 'unique' the restraint is." *Continental Airlines, Inc. v. United Airlines*, 277 F.3d 499, 509 (4th Cir.2002) (quoting 11 H. Hovenkamp, Antitrust Law ¶ 1911a (1998)).

 At one end of the continuum, *per se* analysis is used for restraints that "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se.*" *State Oil Co. v. Khan*, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). Restraints that give rise to *per se* analysis include price fixing, horizontal output restraints, and market-allocation agreements. *Continental Airlines*, 277 F.3d at 509. The Supreme Court has admonished courts against expanding this category, *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), and wisely, Toscano does not argue for its application here. At the other end of the spectrum, rule of reason analysis is used "if the reasonableness of a restraint cannot be determined without a thorough analysis of its net effects on competition in the relevant market." *Continental Airlines*, 277 F.3d at 509. Finally, courts use quick look analysis when "the anticompeti-

require its application to the question of standing. Second, before the court could countenance a *Continental Ore* objection at the summary judgment stage, the plaintiff must produce something more than a bare allegation that the allegedly illicit conduct works in tandem to produce an anticompetitive result. Thus, at the least, Toscano must demonstrate that the defendants actually use the eligibility rules and the media and conflicting events rules in some concerted fashion for anticompetitive purposes.

Toscano, has offered no such evidence. To this end, Toscano's expert, Dr. Tollison, stated that without the media rights and conflicting event rules, there would be competition,

"[a]nd resulting from competition, I think you would have loosened entry into tournaments." (Tollison Depo. at 172:15–16). However, Tollison conceded that he had not done any studies to determine the validity of his hypothesis. (*Id.* at 172:17–19). This is the exact sort of unsubstantiated opinion that is insufficient to withstand scrutiny at the summary judgment stage. *See United States v. Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir.1981) ("[I]n the context of a motion for summary judgment, an expert must back up his opinion with specific facts."). Therefore, the court's standing inquiry is limited exclusively to the media rights and conflicting events rules.

tive impact of a restraint is clear from a quick look, as in a *per se* case, but procompetitive justifications for it also exist. Such intermediate cases may 'involve[ ] an industry in which horizontal restraints on competition are essential if the product is to be available at all,' or in which a horizontal restraint otherwise plausibly 'increase[s] economic efficiency and renders markets more, rather than less, competitive.' " (*Id.*)

■■■■ The Supreme Court's decision in *California Dental Ass'n v. FTC*, clarifies that the use of quick look analysis is reserved for cases in which "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." 526 U.S. 756, 770, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999). *See also American Ad Mgmt.*, 92 F.3d at 789–90. However, before concluding that an alleged restraint has the sorts of anticompetitive effects that justify quick look analysis, courts must consider whether in the context of the allegedly restrained market, the "restrictions might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition." *California Dental Ass'n*, 526 U.S. at 771, 119 S.Ct. 1604.

■■■■ The principles announced in *California Dental Ass'n* lead to application of the rule of reason in evaluating whether the eligibility rules are an unreasonable restraint. The eligibility rules are not so obviously anticompetitive that an observer with even a rudimentary understanding of economics would recognize their anticompetitive effect, *see California Dental Ass'n*, 526 U.S. at 770, 119 S.Ct. 1604, nor are they so anticompetitive on their face that they would otherwise merit *per se* analysis. *See Continental Airlines*, 277 F.3d at 509. To the contrary, a rudimentary understanding of the market demonstrates that the eligibility rules may have net procompetitive effects: they ensure that spectators see the marquee players they want to see thereby helping to attract sponsors who ultimately finance the Senior PGA Tour and create the product. Moreover, it is not obvious that the eligibility rules affect economic competition at all. In producing an entertainment product, the Tour incorporates an element of competition as part of the product but the senior golfers are not in economic competition with one another any more than the celebrity participants in a game show or the runners in a track meet. The presence of obvious procompetitive justifications for the eligibility rules, in the sense that they help to create the product, and the corresponding absence of clear anticompetitive effect, require application of full rule of reason analysis.

## B. *Rule of Reason Analysis*

■■■■ Under the rule of reason, courts determine if a practice unreasonably restrains trade in violation of the Sherman Act by "analyz[ing] the degree of harm to competition along with any justifications or procompetitive effects to determine whether the practice is unreasonable on balance." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1410 (9th Cir.1991). The rule of reason works by employing a burden shifting framework. *See California Dental Ass'n*, 526 U.S. at 775 n. 12, 119 S.Ct. 1604 (endorsing burden shifting approach to rule of reason). The plaintiff has the initial burden of establishing that "the restraint produces significant anticompetitive effects within the relevant product and geographic markets. If the plaintiff meets this burden, the defendant must come forward with evidence of the restraint's procompetitive effects, including, for example a showing that the restraint furthers consumer welfare by providing a product that would not otherwise exist. *See Nat'l Collegiate Athletic Ass'n,*

468 U.S. at 102, 104 S.Ct. 2948. The plaintiff must then show that 'any legitimate objectives can be achieved in a substantially less restrictive manner.' " *Hairston v. Pac. 10 Conference,* 101 F.3d 1315, 1319 (9th Cir.1996) (citing *Bhan,* 929 F.2d at 1413); *see also Law,* 134 F.3d at 1019 (applying similar burden shifting analysis).

 The court finds that the eligibility rules withstand analysis under the rule of reason because Toscano has failed to carry his initial burden of demonstrating significant anticompetitive effects. Toscano's evidence of anticompetitive effect consists of statements by the PGA Tour's Chief Counsel, Edward Moorhouse, that the Senior PGA Tour is not "the finest raw competitive golf in the world" and that it is "an entertainment product and a product that we need to sell to sponsors and TV networks." (Moorhouse Depo. at 98:3–4; 105:15:17). Toscano's argument confuses economic competition in the sense of antitrust laws with athletic competition that is

staged for purposes of entertainment. Plaintiff erroneously assumes that the Senior PGA Tour is not competitive in the marketplace because the participants are not selected solely on the basis of athletic ability. There is ample caselaw, however, that distinguishes between athletic competition on the one hand, and economic competition on the other.[12] Further, courts uniformly reject the equation of athletic competition with economic competition because it leads inexorably to antitrust attacks on every sporting rule of eligibility.[13] Indeed, Toscano's argument might preclude the PGA Tour from employing any eligibility rules or allowing any exemptions based on past performance.

Toscano offers no other evidence to demonstrate that the eligibility rules have significant anticompetitive effects. His own expert, Dr. Tollison, is not prepared to venture an opinion that the eligibility rules are anticompetitive.[14] Thus, at the summary judgment stage, Toscano has not

---

**12.** *See, e.g., M & H Tire Co. v. Hoosier Racing Tire Corp.,* 733 F.2d 973, 977–78 (1st Cir. 1984) ("The drivers are not in economic competition with one another and while they are specifying the parameters within which they will compete on the race track, what is missing is any effect upon economic competition among the drivers as was present in Fashion and Eastern States. While the tracks may be economic competitors in some sense, the rule does not limit economic competition among them either.") (rule that permitted only one tire to be used at race track did not violate antitrust law under rule of reason); *Mid–South Grizzlies v. Nat'l Football League,* 720 F.2d 772, 787 (3d Cir.1983) ("The essential facilities doctrine is predicated on the assumption that admission of the excluded applicant would result in additional competition, in an economic rather than athletic sense. The Grizzlies have simply failed to show how competition in any arguably relevant market would be improved if they were given a share of the NFL's monopoly power."); *Baseball at Trotwood, LLC v. Dayton Prof'l Baseball Club,* 113 F.Supp.2d 1164, 1172 (S.D.Ohio 1999) ("the Plaintiffs were

seeking to join the Midwest League, rather than to compete in an economic sense with that League, the owners of its teams or the [national league organization]") (summary judgment for defendant, plaintiff did not suffer antitrust injury).

**13.** The sole case that Toscano cites in support of his argument, *Medlin v. Prof'l Rodeo Cowboys Ass'n, Inc.,* 1991 WL 340303 (D.Col. 1991), was a brief preliminary injunction order that does not cite any antitrust precedent and that was subsequently vacated nunc pro tunc as part of a stipulated order. *Medlin v. Prof'l Rodeo Cowboy Ass'n,* 1992 U.S. Dist. LEXIS 7653 (D.Col. March 31, 1992).

**14.** Tollison stated in his deposition:

Q. "You don't know, sir, whether or not the PGA TOUR's eligibility rules would be any different than they currently are if those two rules, the conflicting event and media rights rule, did not exist, correct?

A. I do not. And I would—and if they were, I would have [no] objection to it.

Q. So you just don't know one way or another whether or not rescinding or doing away

come close to carrying his burden of proving anticompetitive conduct.

Even if Toscano had provided evidence of significant anticompetitive effects, the defendants have amply demonstrated that the eligibility rules have a series of procompetitive justifications. The eligibility rules provide a product that would not otherwise exist and, therefore, they further consumer welfare. (*See Nat'l Collegiate Athletic Ass'n*, 468 U.S. at 102, 104 S.Ct. 2948 ("And the integrity of the 'product' cannot be preserved except by mutual agreement. . . . Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable.")). As the defendants explain, the eligibility rules have the legitimate purpose of

(1) keeping as many prominent and proven players as possible in the pro-am events, (2) maintaining fan interest and sponsor support, (3) not cutting the field of players at the end of the first or second day of play so that prominent and proven players will enter tournaments and remain in them to the finish, and (4) maintaining consistent, long-term eligibility criteria so that proven, well-known players from the regular PGA TOUR will, upon turning age 50, consider the SENIOR PGA TOUR the best option to other alternatives then available to them.

Defs.' SUF at ¶ 19. Thus, the 78–player field ensures that Senior Tour tournaments can take place without a cut so that fans are able to watch the most popular players compete, a characteristic essential to maintaining sponsor interest. In short, the eligibility rules sustain the Senior PGA Tour.

Having carried their burden of demonstrating significant procompetitive justifications for the eligibility rules, the burden shifts back to Toscano to prove that the defendants' procompetitive objectives could be achieved in a less restrictive manner. Toscano, however, has not offered even "a mere scintilla of evidence" in this regard. In his deposition, Toscano speculated that a field of between 108 and 144 golfers would be better, but he offers no evidence as to why this would make the market for professional golf more competitive in the antitrust sense, and he fails to consider the effects of an expanded field on the Tour's sponsors. (Toscano Depo. at 47:7–9; Finchem Depo. at 60:6–11 (noting strong objection from sponsors to increasing size of playing field and instituting a cut)). Finally, when pressed, Toscano conceded that he did not know how players should be selected and then suggested that perhaps a "commission based upon various bodies involved in golf" could make the selections. (Toscano Depo. at 135:15–20; 137:23–24).

Thus, even if Toscano had demonstrated that the eligibility rules had a significant anticompetitive effect, he would still lose under the rule of reason because he both fails to rebut the fact that there are procompetitive justifications for the rules and to show that the procompetitive objectives could be achieved in a less anticompetitive manner. For these reasons, the court finds that there is no merit to Toscano's attack on the eligibility rules.[15]

with the conflicting event and media rights rule would have in any way altered Mr. Toscano's ability to get into SENIOR PGA TOUR events? You don't know one way or the other, do you?
A. No, I don't."
Tollison Depo. at 196:12–23.

15. The court's analysis of the eligibility rules under Section 1 of the Sherman Act also applies to Toscano's Section 2 claims because " 'a § 1 claim insufficient to withstand summary judgment cannot be used as the sole basis for a § 2 claim.' " *Williams v. I.B. Fischer Nevada*, 999 F.2d 445, 448 (9th Cir.

## IV. Proof of Damages

 There is another reason why the Tour defendants are entitled to summary judgment. Antitrust plaintiffs who establish standing and an antitrust injury are generally entitled to some leeway in proving damages. *See Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.,* 773 F.2d 1506, 1511 (9th Cir.1985) ("Defendants whose illegal conduct operates to exclude others from the relevant market, should not benefit because their wrongdoing makes it more difficult for the plaintiff to establish the precise amount of its injury."). "The jury is allowed to act on probable and inferential proof in determining the amount of damages even though such an award may be an approximation." *Id.* However, plaintiffs "must provide evidence such that the jury is not left to 'speculation or guesswork' in determining the amount of damages to award." *Id.* at 1509 (citing *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 263–65, 66 S.Ct. 574, 90 L.Ed. 652 (1946)); *see also* II P. Areeda, R. Blair & H. Hovenkamp, Antitrust Law ¶ 391, at 481 (2d ed. 2000) ("Damage evidence will be deemed insufficient as a matter of law if it permits no more than 'pure speculation and guesswork.' Thus, in the world of antitrust damages, 'speculative' is an epithet that is used to characterize insufficient damage proof and dooms the damage calculation.").

 Although the Supreme Court's decision in *Bigelow* entitles an antitrust plaintiff to leeway in proving the amount of damages, it is not a prescription for the antitrust plaintiff to shirk his responsibility to present competent and probative evidence from which a jury can reasonably infer damages. Consequently, summary judgment for defendants is proper if the plaintiff's proof of damages is "speculative" because (1) there is no admissible evidence of damages, (*see McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 808 (9th Cir.1988) (district court excluded expert witness report due to flaws in analysis and then granted summary judgment because there was no evidence left of damages); *D.A. Rickards v. Canine Eye Registration Found., Inc.,* 704 F.2d 1449, 1452 (9th Cir.1983) (plaintiff neither identified expert witness nor designated documents supporting damages claim)); or (2) if the plaintiff's sole evidence of damages is seriously flawed in some way that cannot be remedied before or at trial, (*see City of Vernon v. S. Cal. Edison Co.,* 955 F.2d 1361, 1372 (9th Cir. 1992) (sole evidence of damages was expert study that failed to segregate losses, if any, caused by acts which were not antitrust violations from those that were)).

 Defendants are entitled to summary judgment on their claims for the separate reason that Toscano's evidence of damages would require a jury to engage in speculation or guesswork. Toscano's lone expert witness did not provide any evidence on damages. (Tollison Depo. at 166:17–25). Further, although Toscano submitted an affidavit on damages, it is flawed in several respects and fails to overcome a motion for summary judgment. Toscano argues that he would have earned at least $200,000 per year playing from 1997 until 2004 based on two calculations: (1) he had average yearly Tour winnings from 1993 to 1995 of $200,000; and (2) multiplying his average expected winnings [16] from the five tournaments he en-

---

1993) (quoting *Thomsen v. Western Elec. Co.,* 680 F.2d 1263, 1267 (9th Cir.1982)).

**16.** This calculation is actually more speculative than it first appears. It is based on Toscano's assumption that he would have qualified for a particular tournament if the

eligibility rules were more relaxed, and that he would have shot the same score for each round of the tournament. For example, Toscano states that "[a]t the 2001 Transamerica Senior PGA Tour Tournament in Napa, I shot a 71 in Monday qualifying finishing fifth, missing the tournament by one spot. I would

tered in 2001 by thirty, the minimum number of tournaments he played from 1993 to 1995, also comes to $200,000. (Toscano Aff. at ¶¶ 13, 15). Finally, Toscano asserts that in 1997 he earned approximately $20,000 in 10–12 Nitro Senior Series Tournaments and that if it had not been driven out of business due to the Senior Tour's media rules, he would have earned at least an additional $20,000 per year between 1997 and 2005 on other tours. (*Id.* at ¶ 11).

As evidence of antitrust damages, Toscano's affidavit is riddled with theoretical problems that makes summary judgment appropriate. First, Toscano never provides a theoretical foundation for his proof of damages. He attempts to simply extrapolate his future profits from a period of alleged anticompetitive activity. However, this does not resemble any of the three commonly used methods for projecting antitrust damages. *See Dolphin Tours,* 773 F.2d at 1511 (describing before and after, yardstick, and market share projection approaches).

▮▮▮ Even assuming that Toscano had a reliable methodology for establishing damages, his evidence entirely ignores "competitive reaction." *Id.* at 1512 n. 12. In calculating damages, the antitrust plaintiff may not benefit from the anticompetitive market effects that are the very basis for the suit. As the Ninth Circuit stated in *Dolphin Tours:*

> we conclude that the burden of anticipating this hypothetical market is appropriately placed on antitrust plaintiffs. In projecting free market profits, antitrust plaintiffs are not entitled to assume favorable aspects of an anticom-

petitive market such as an unnatural price differential between themselves and their competitors and limited competition from third parties because of the difficulty of entering the market. Such an approach would overestimate the profits an antitrust plaintiff would have made absent the anticompetitive activity and then under the antitrust laws treble this artificially high damage estimate.

773 F.2d at 1512. But Toscano has completely failed to account for how his damages might change in a truly competitive environment. He neither accounts for the fact that it would be more difficult for Toscano to qualify under liberal eligibility rules that encourage more senior golfers to attempt to qualify,[17] nor the fact that changing the eligibility rules might well deter Tour sponsors causing the number of events and prize money to decline. Under *Dolphin Tours,* Toscano may not ignore these likely changes in the market.

Moreover, Toscano has not demonstrated that the period from 1993 to 1997 is "a reliable predictor of [his] future experience." II P. Areeda, R. Blair & H. Hovenkamp, Antitrust § 391e, at 485 (2d ed.2000). Toscano acknowledges his relative lack of success after 1997, as compared to 1993 through 1995, even though the same eligibility rules governed in each period. Especially in a competitive activity like professional golf, and where Toscano acknowledges suffering a shoulder injury around the time that his performance began to decline, Toscano's own damages evidence undermines his claim of a causal relationship between the market restraint and his alleged injury. Since he actually

have won $8,580 if I had made the tournament and shot that score all week." (Toscano Aff. at ¶ 14).

17. Toscano stated in his deposition that "[t]here's millions of senior players out there

that have ability that you could—you can have—you could have more than one tournament a week going on." Toscano Depo. at 110:18–19.

earned $200,000 a year on the Tour under the eligibility rules, it seems unpersuasive to blame these same rules for his earnings decline after 1997. Thus, whether styled as an inability to establish causation or an inability to prove damages with reasonable certainty, Toscano has not provided sufficient evidence of damages. (*See McGlinchy,* 845 F.2d at 808 (defendant's motion for summary judgment; experts' studies and testimony on damages excluded, court held "appellants did not make a showing sufficient to establish the amount, causation, or fact of damages")).

Finally, unlike in *Dolphin Tours* where the flaws in the plaintiff's evidence of damages could be easily remedied prior to trial, Toscano has no way to rectify the problems with his evidence. *Id.* at 1513 ("Dolphin has presented evidence from which a jury could reasonably estimate the amount of Dolphin's injury without speculation if Dolphin's damage evidence were filled in by testimony at trial and by tabulation of survey results which the record indicates are available to Dolphin."). For these reasons, even if Toscano could survive summary judgment on the merits, the defendants' motion would still be granted because his proof of damages would require a jury to engage in speculation or guesswork.

## V.

The Senior PGA Tour is an entertainment product presenting athletic competition between mostly well known professional golfers over the age of 50. It uses the eligibility rules to secure the participation of marquee players for the entirety of each tournament. With this business model, it has survived where other tours have failed. Toscano does not show that the eligibility rules are an unreasonable restraint of trade. The reasonableness of the Tour's media rights and conflicting events rules is a question that must be left for another day because Toscano has failed

to demonstrate that he is the proper party to challenge these rules. Finally, his claim of damages is only speculative and tenuous. For the foregoing reasons, the defendants' motion for summary judgment is GRANTED.

IT IS SO ORDERED.